Filed 12/30/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H038123 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. CC950489) |
| v. | |
| SAMUEL GHEBRETENSAE, | |
| Defendant and Appellant. | |

The Santa Clara County District Attorney charged Samuel Ghebretensae (appellant) with possession of cocaine base for sale (Health & Saf. Code, § 11351.5, count one) resisting arrest (Pen. Code, § 148, count two) and transportation of cocaine base (Health & Saf. Code, § 11352, subd. (a), count three). The information by which appellant was charged contained two prior conviction allegations within the meaning of Health and Safety Code section 11370, subdivision (c) and a prior prison term allegation within the meaning of Penal Code section 667.5, subdivision (b).

Following a jury trial, appellant was found guilty as charged and the jury found true the prior conviction allegations and the prior prison term allegation. Subsequently, the court sentenced appellant pursuant to Penal Code section 1170, subdivision (h) to a blended sentence of nine years—six years to be served in the county jail followed by three years of mandatory supervision by the probation department.

Appellant filed a timely notice of appeal. On appeal, appellant raises six issues, which we shall outline later. For reasons that follow we strike a supervision fee that the court imposed. As so modified, we affirm the judgment.

*Facts and Proceedings Below*

San Jose Police Officer Brian Winco testified that on July 25, 2009, he was assigned to patrol in downtown San Jose. At approximately 9:00 p.m. that evening he was conducting surveillance in Fountain Alley—an area well known for drug trafficking. Officer Winco was in plain clothes in an attempt to blend in with the surroundings. Officer Winco saw appellant loitering nearby. A bus pulled up close to appellant's location and a passenger got off the bus; this passenger was identified as Allen Talton. Talton walked up to appellant; they spoke briefly. Appellant showed Talton something he had in his hand and then retrieved something from his pocket. Talton moved closer to appellant and they exchanged something that each of them held. Immediately, the two separated and walked away from each other. Based on his training and experience, Officer Winco believed that the two men had engaged in a hand-to-hand drug transaction.

Officer Winco put on his police vest and made contact with Talton. He handcuffed him and searched his pockets. Officer Winco recovered a prescription Vicodin pill during the search. Talton admitted purchasing the pill from appellant. During the time that it took to detain Talton, appellant had walked about 20 to 25 feet away across the light rail tracks. Appellant looked back; according to Officer Winco he appeared startled when he saw that Talton was being detained. Immediately, appellant began jogging away.

Officer Winco called for assistance; he left Talton with other officers and then set off to find appellant. When he failed to find him, Officer Winco returned to where Talton was being held. Ultimately, Officer Winco began driving around in his unmarked police car and continued to look for appellant. Shortly thereafter, he saw appellant outside a Jack-in-the-Box restaurant. Officer Winco radioed for assistance; Officer Rapp

2

responded in his marked patrol car.[1]  Officer Rapp got out of his car and ordered appellant to stop; immediately, appellant turned and fled.  Officer Rapp chased him as he fled through a parking lot.  He did not follow appellant when appellant fled through a private backyard, rather, Officer Rapp used his police radio to inform other officers of appellant's position.  A short time later Officer Winco saw appellant as he emerged onto a residential street; he ordered appellant to stop, but appellant climbed over a fence.  Eventually, Officer Winco managed to detain appellant and force him to the ground while another officer handcuffed appellant.  A search of appellant's person uncovered $241 in cash.  At the time of his arrest, appellant was wearing a long-sleeved button-down checked shirt over a white t-shirt; at the time of the drug transaction appellant was wearing a white t-shirt and blue jeans.

While Officer Winco was chasing appellant he saw what he thought was a piece of plastic fall from appellant's pocket and hit the sidewalk.  After he apprehended appellant, Officer Winco returned to the spot where he saw the object fall; he recovered a piece of plastic wrap tied in a knot.  When it was examined, it was determined to contain 14 individually packaged "twists" of cocaine base.

*Discussion*

*I. Exclusion of Impeachment Evidence*

At trial, appellant sought to introduce evidence of two incidents that involved Officer Winco for purposes of impeaching his credibility.  Trial counsel asserted that the incidents demonstrated Officer Winco's willingness to lie.  After conducting several Evidence Code section 402 hearings, the court excluded the evidence pursuant to Evidence Code section 352.  Appellant argues that the court abused its discretion in so doing.

---

[1]     Officer Rapp was not available to testify at the time of trial as he was serving in Afghanistan.  Accordingly, his testimony from the preliminary examination in this matter was read to the jury.

Trial counsel sought to impeach Officer Winco with evidence that he had falsely arrested a probationer by the name of Gary Arthur. Arthur was on felony probation for a drug conviction; as part of his probation he was participating in a rehabilitation program through the Salvation Army. According to Arthur, on January 24, 2008, Officer Winco and another officer took him out of the program and asked him to become an informant; they threatened to arrest him on a probation violation if he refused. Arthur said that when he was unable to provide the information they wanted, the officers took him into custody and obtained a probation hold. A few days later, the probation hold was dropped and he was released from custody.

Gustavo Sotelo was Arthur's probation officer at the time of Arthur's arrest in January 2008. Sotelo was not working on the day Arthur was arrested. However, Edna Thomas, a probation supervisor, responded to the officers' call about Arthur. She placed a probation hold on Arthur. Arthur's file did not reflect any information as to why Arthur was arrested and Thomas could not remember any of the circumstances leading to the probation hold. She testified that in general the arresting officer provides the probation department with background about the alleged violation. While she notes information about the probation hold in the case file, sometimes, if she gets busy she is unable so to do. Although Thomas could not recall any of the circumstances leading to the hold, she testified that she would not have authorized a hold if she did not believe it was legitimate.

Sotelo testified that when he returned to work a few days after Arthur's arrest, he decided to drop the probation hold because he wanted Arthur to continue in the Salvation Army program. Sotelo did not think finding a violation was necessary; he was concerned that Arthur would be cut from the rehabilitation program if he was found to be in violation of his probation.

The trial court excluded Arthur's testimony. The court explained, "The rule in a trial is that all relevant evidence should be admissible. But relevance requires more than

4

some vague suggestion that an officer may have made a false arrest in the past. [¶] I don't think you have shown that. [¶] It would require a mini-trial to determine a matter of minimal importance. [¶] I think it would create a substantial danger of confusing the jury. [¶] I think it would definitely require undue time consumption. [¶] And I don't think it would establish anything—that Officer Winco did anything wrong."

In addition to the foregoing evidence, appellant sought to introduce evidence that during a recess in his preliminary hearing, Officer Winco engaged in a conversation about the facts of appellant's case with another officer and when confronted by appellant's attorney, lied about what he was doing.

Jessica Burt-Smith, a public defender, testified that she was sitting in the courtroom during a break in appellant's preliminary hearing. Annrae Angel, appellant's counsel, had stepped out of the courtroom. Ms. Smith saw Officer Rapp, who was designated as the investigating officer, approach Officer Winco; Officer Winco had just completed his testimony. Ms. Smith testified that she overheard Officer Rapp and Officer Winco talk about appellant's case. Ms. Smith could not remember specifics of the conversation, but believed the conversation was "something about Officer Winco's testimony and . . . how the officers recalled that [appellant] was the person that they believed committed the crime." Ms. Smith saw the bailiff approach the officers and they began talking about something else. Ms. Smith alerted Ms. Angel about the conversation when Ms. Angel reentered the courtroom. According to Ms. Smith, Ms. Angel approached the officers and told them she thought it was inappropriate for them to be discussing the case. Ms. Smith heard Officer Winco say "we hadn't been talking about the case" or something to that effect.

Ms. Angel testified that Ms. Smith did not alert her to the conversation that had been occurring; rather, it was still ongoing when she entered the courtroom. Although Ms. Angel knew that the court had not admonished the witnesses not to discuss the case, nonetheless, she approached the officers and told them not to discuss the case. Ms. Angel

5

recalled that Officer Winco said that they were not talking about the case; she testified that she recalled him saying something about sports. She conceded that her contemporaneous notes reflected that Officer Winco's response was that the conversation was just about the deputy. She clarified that she may not have written down everything that was said; that it might have been about the deputy or sports. She acknowledged that she did not think it was important at the time, and she did not raise the issue with the court or with Officer Rapp on cross examination, as there was no court order not to discuss the case.

The trial court excluded the evidence about the conversation. The court explained, "I believe this testimony on this issue would just create confusion for the jury. [¶] The testimony is inconsistent. Apparently the fact that Officer Winco and Officer Rapp were discussing the case is not at issue. [¶] And they had a right to discuss the case. Miss Angel had no right to go up to them and tell them they couldn't talk about it. [¶] But neither Miss Smith nor Miss Angel can agree on what Officer Winco said to her. [¶] And without that I simply don't find that it is probative of anything. [¶] I don't think it's relevant. [¶] I think it would be confusing to the jury and any amount of time that it would take up, and I am sure it would take up at least an hour, is simply outweighed by the fact that it is going to be confusing. [¶] It is basically somewhat speculative. [¶] It is speculative about what the officer said. And I'm not going to allow the testimony of Jessica Smith or Annrae Angel because under 352 I believe that it would be more prejudicial than probative and it is not a material issue in this case. There is simply not consistency between the two reports to make it useful to the jury."

Appellant demanded the opportunity to attack Officer Winco's credibility at trial using the foregoing evidence, which he asserted, indicated "that Officer Winco, the primary witness in the People's case has at least on one occasion shown a willingness to fabricate and to lie." Appellant argued that he had a "right to present a defense pursuant to the United States and California Constitutions."

6

Impeachment evidence is evidence that "calls into question the witness' veracity." (*Gallo v. Peninsula Hospital* (1985) 164 Cal.App.3d 899, 904.)  To impeach a witness is to discredit the witness.  (Witkin, Cal. Evid. (4th ed. 2000) Presentation at Trial, § 258, p. 329; see *Howard Contracting, Inc. v. G.A. MacDonald Construction Co., Inc.* (1998) 71 Cal.App.4th 38, 53 [a broad definition of impeach is to dispute, disparage, deny, or contradict].)  Evidence Code section 780 provides that a jury may "consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony . . . ."  It outlines a number of ways in which a witness may be impeached, including "his character for honesty or veracity or their opposites."  (Evid. Code, § 780, subd. (e).)

If the alleged impeachment evidence was erroneously excluded, we review errors in the application of the "ordinary rules of evidence" such as Evidence Code section 352 under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836.  (*People v. Marks* (2003) 31 Cal.4th 197, 226–227.)  Under this standard, if a trial court erroneously excludes evidence, a defendant must show on appeal that it is reasonably probable he or she would have received a more favorable result had that evidence been admitted. (*People v. Watson, supra*, 46 Cal.2d at p. 836; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1125.)

At the outset, we reject any suggestion by appellant that the proffered evidence was essential in order to preserve his Sixth Amendment right to present a defense.  He argues that there can be no doubt that the trial court's ruling severely hampered his right to present a complete defense, as well as his rights to confrontation and due process of law.

Our Supreme Court has rejected the attempt to transform evidentiary claims into errors of constitutional proportion.  Specifically, in *People v. Fudge* (1994) 7 Cal.4th 1075, the court explained, "As a general matter, the '[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense.'

7

[Citations.]  Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense.  [Citation.]  If the trial court misstepped, '[t]he trial court's ruling was an error of law merely; there was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense.'  [Citation.]  Accordingly, the proper standard of review is that announced in *People v. Watson* (1956) 46 Cal.2d 818, 836 . . . and not the stricter beyond-a-reasonable-doubt standard reserved for errors of constitutional dimension (*Chapman v. California* (1967) 386 U.S. 18, 24 . . . .)"  (*Fudge*, *supra*, 7 Cal.4th at pp. 1102-1103.)

Moreover, the exclusion of impeachment evidence on collateral matters, which have only a slight probative value on a witness's veracity, does not infringe on the right to confrontation.  (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679 [106 S.Ct. 1431]; *People v. Ardoin* (2011) 196 Cal.App.4th 102, 119.)

" 'Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time.  [Citation.]'  [Citation.]  A trial court's discretionary ruling under Evidence Code section 352 will not be disturbed on appeal absent an abuse of discretion.  [Citation.]  ' "[T]he latitude section 352 allows for exclusion of impeachment evidence in individual cases is broad.  The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues."  [Citation.]'  [Citation.]"  (*People v. Lewis* (2001) 26 Cal.4th 334, 374-375.)

Assuming, without deciding, the alleged impeachment evidence was erroneously excluded, as noted, we review errors in the application of the "ordinary rules of evidence" under the standard set forth in *People v. Watson, supra,* 46 Cal.2d 818, 836.  (*People v. Marks, supra,* 31 Cal.4th 197, 226–227.)  Under the *Watson* standard, if a trial court

8

erroneously excludes evidence, a defendant must show on appeal that it is reasonably probable he or she would have received a more favorable result had that evidence been admitted. (*Watson,* at p. 836; *People v. Rodrigues, supra,* 8 Cal.4th 1060, 1125.)

We conclude that any error in excluding the alleged impeachment evidence was harmless. First, the evidence regarding Arthur did not conclusively establish that he was falsely arrested. As to the perceived lie by Officer Winco, it is a much closer question as to whether the jury would have had a different impression of Officer Winco's testimony had they heard the proposed impeachment evidence. Nevertheless, the jurors, who observed Officer Winco testify about the events of July 25, 2009, on both direct and cross-examination, could judge Officer Winco's credibility for themselves. Moreover, defense counsel attacked Officer Winco's credibility in other ways. Specifically, defense counsel suggested that Officer Winco incorrectly characterized appellant's racial background and skin tone in the police report. Defense counsel noted that appellant was wearing different clothing when he was arrested and that Officer Winco did not memorialize Talton's statements about appellant giving him the Vicodin. Defense counsel attacked Officer Winco for not attempting to interview any pedestrians who were in the area of Fountain Alley at the time of the drug sale or obtain any surveillance footage from nearby businesses. Moreover, defense counsel cross examined Officer Winco about his inconsistent testimony at the preliminary hearing in which he stated that Officer Rapp was not holding a gun when he approached appellant.[2] On this record, we conclude there was no reasonable probability the jury would have determined that Officer Winco was lying about the events of July 25, 2009, if Ms. Smith and Ms. Angel had been permitted to testify to the events that occurred at the preliminary hearing. (*People v. Mickle* (1991) 54 Cal.3d 140, 169 [exclusion of impeachment evidence was harmless

---

[2] According to Officer Rapp's preliminary hearing testimony he drew his gun, but held it at his side when he first made contact with appellant.

9

when evidence would not have painted a materially different picture of the witness's credibility].)

*II. Admission of Evidence of Appellant's Prior Offense to Prove Knowledge and Intent*

Appellant argues that the trial court committed reversible error in admitting evidence of uncharged offenses to prove his knowledge of the presence of the contraband, its character as contraband, and on the issue of his intent to sell because he offered to stipulate that if the jury found him to have possessed the contraband he was aware of the character of the contraband as a controlled substance and had the intent to sell the contraband.

The court permitted the prosecution, over defense objection, to present evidence of uncharged misconduct by appellant. Specifically, San Jose Police Sergeants Carl Sheppard and Paul Messier were allowed to testify concerning the arrest of appellant on December 5, 2000, following a hand-to-hand drug transaction that Sergeant Sheppard had observed. Sergeant Messier described how he chased appellant on foot through St. James Park, where appellant jumped into a fountain and then threw something into the fountain. Sergeant Messier testified that appellant got out of the fountain, pushed him over and took a combative stance before he was able to arrest appellant. Appellant had $158 in cash and was found to be under the influence of narcotics. Sergeant Messier located 10 bindles of a white rock wrapped in a plastic material floating in the water. Based on his training and experience he believed that it was cocaine base and that it was possessed for sale.

Appellant asserts that the trial court's ruling was prejudicial error because it erroneously exposed the jury to inadmissible and inflammatory " 'propensity' " evidence that created an unacceptable risk that the jury would find him guilty not based on the facts of the charged offense but on the basis of his purported criminal propensity and disposition to commit offenses such as the charged offense.

10

"The rules governing the admissibility of evidence of other crimes are well settled." (*People v. Roldan* (2005) 35 Cal.4th 646, 705, disapproved of on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Evidence Code section 1101, subdivision (a) provides, "Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

However, Evidence Code section 1101, subdivision (b) (hereafter section 1101(b)) provides that evidence that a person committed a crime, civil wrong or other act is admissible when relevant to prove some fact other than the person's disposition to commit such an act. Such evidence may be admitted to prove the person's knowledge of relevant facts, among other things. (§ 1101(b).)[3] To be admissible, the evidence must be relevant to some material fact which is in issue, must have a tendency to prove that fact, and must not contravene other policies limiting admission, such as Evidence Code section 352.[4] (*People v. Thompson* (1988) 45 Cal.3d 86, 109.) " 'We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352.' [Citation.]" (*People v. Davis* (2009) 46 Cal.4th 539, 602.)

---

[3]    In full, section 1101(b) provides, "(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

[4]    Evidence Code section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

11

To obtain a conviction for possession of a controlled substance for sale, the prosecution must prove that the defendant had knowledge of both the presence of the contraband and its illegal character. (*People v. Meza* (1995) 38 Cal.App.4th 1741, 1745-1746.) Prior incidents of possession of an illegal drug are relevant to prove the knowledge element. (*People v. Pijal* (1973) 33 Cal.App.3d 682, 691.)

"Evidence of *intent* is admissible to prove that, if the defendant committed the act alleged, he or she did so with the intent that comprises an element of the charged offense. 'In proving intent, the act is conceded or assumed; what is sought is the state of mind that accompanied it.' [Citation.] For example, in a prosecution for shoplifting in which it was conceded or assumed that the defendant left the store without paying for certain merchandise, the defendant's uncharged similar acts of theft might be admitted to demonstrate that he or she did not inadvertently neglect to pay for the merchandise, but rather harbored the intent to steal it." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 394, fn. 2.) "We have long recognized 'that if a person acts similarly in similar situations, he probably harbors the same intent in each instance' [citations], and that such prior conduct may be relevant circumstantial evidence of the actor's most recent intent. The inference to be drawn is not that the actor is *disposed* to commit such acts; instead, the inference to be drawn is that, in light of the first event, the actor, at the time of the second event, must have had the intent attributed to him by the prosecution. [Citations.]" (*People v. Robbins* (1988) 45 Cal.3d 867, 879, superseded on other grounds as recognized in *People v. Jennings* (1991) 53 Cal.3d 334, 387, fn. 13; *People v. Gallego* (1990) 52 Cal.3d 115, 171.)

We have no doubt that the evidence was relevant and admissible on the issues of appellant's knowledge of the character of the contraband as a controlled substance and on the issue of his intent to sell the contraband.

The general rule is that the prosecution cannot be compelled to accept a stipulation for purposes of rendering evidence irrelevant if the effect would be to deprive the

12

prosecution's case of its persuasiveness and forcefulness, unless the evidence is more prejudicial than probative. (See *People v. Waidla* (2000) 22 Cal.4th 690, 723, fn. 5; *People v. Thornton* (2000) 85 Cal.App.4th 44, 49.)

However, " '[I]f a defendant offers to admit the existence of an element of a charged offense, the prosecutor must accept that offer and refrain from introducing evidence of other crimes to prove that element to the jury,' [citation]" except "if evidence remains relevant to an issue not covered by the stipulation . . . ." (*People v. Karis* (1988) 46 Cal.3d 612, 639); or, where the stipulation would drain the prosecution's case of its persuasive or forceful value. (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1007.)

The trial court's decision on whether to force the prosecution to accept a stipulation in lieu of evidence is a matter within its discretion, as is its implicit resolution of the probative and prejudicial weight of the evidence. (*People v. Waidla*, *supra*, 22 Cal.4th at pp. 723 & fn. 5, 724.)

Assuming, without deciding, the trial court erred in admitting the evidence of appellant's prior drug offense in lieu of counsel's proposed stipulation, we conclude that any error was harmless. It is well settled that claims of error in the admission of prior crimes evidence are evaluated under the standard of *People v. Watson, supra,* 46 Cal.2d 818 (*People v. Welch* (1999) 20 Cal.4th 701, 749–750, [erroneous admission of other crimes evidence subject to *Watson* harmless error standard].)

The crux of appellant's prejudice argument is that the jury would have used the evidence as propensity evidence. However, the trial court gave a limiting instruction to the jury that informed them that they could consider appellant's past conviction for the limited purpose of determining whether he was aware of the presence of the substance, whether he knew of its narcotic nature, and whether he possessed it with the intent to sell it. Specifically, the court told the jurors "do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime." Furthermore, during closing argument, both counsel stressed to the jurors the proper use of the evidence and

13

that they could not use the evidence of the prior conviction as a basis to assume that appellant committed the current offense.  We reject any suggestion by appellant that the jury was likely to have disregarded the instruction; such a suggestion is based on pure speculation.  We must presume that jurors are "able to understand and correlate instructions" and further are "presumed to have followed the court's instructions.  [Citation.]"  (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

Further, we reject appellant's suggestion that the evidence against him was weak because Officer Winco did not see where the recovered contraband came from, there were no fingerprints on the item and Officer Winco's police report contained internal inconsistencies and inaccuracies, which suggests that the prosecution's case was not an overwhelming one, absent evidence of his prior conduct.

To the contrary, the evidence of appellant's guilt was strong.  He was observed engaging in a hand-to-hand drug transaction; and he fled immediately upon seeing that Talton had been detained and again when ordered to stop by Officer Rapp.  Further, Officer Winco saw the bag of cocaine base fall from appellant's pocket.  Expert testimony from San Jose Police Officer Junsun Lee established that the area where appellant was seen is "the number one location in Santa Clara County for crack cocaine sales, and purchases."  Further, the bag dropped by appellant contained cocaine base, which expert testimony established was packaged for sale.

Given the court's limiting instruction and the strong evidence of appellant's guilt, we conclude that it is not reasonably probable appellant would have received a more favorable result had the evidence of his prior drug offense been excluded.

III. *Pitchess Material*

Appellant claims that the trial court's denial of his request for supplemental *Pitchess* material was erroneous.  Respondent submits that this court should review the sealed declaration submitted in connection with trial counsel's request to determine if it

14

establishes good cause for the disclosure of the supplemental material. Appellant agrees that this is the correct procedure.

*Background*

On November 10, 2010, under the procedure outlined in *Pitchess v. Superior Court* (1974) 11 Cal.3d 531, the trial court granted appellant's motion for access to certain information in Officer Winco's personnel file. After an in camera hearing, the court ordered that defense counsel be provided with contact information for one individual who had made a complaint against the officer. On January 20, 2011, appellant filed a motion for "supplemental disclosure of any and all verbatim reports, documents, memos, notes and/or audio or video recordings concerning the previously disclosed complaints and/or witnesses" from Officer Winco's file. The trial court denied the motion "for the reasons outlined by the City supported by their citation to *Alvarez v. Superior Court* (2003) 117 Cal.App.4th 1107, 1110."

Appellant contends that the trial court's ruling was erroneous and violated his state and federal constitutional rights to due process and to present a defense.

Traditionally, *Pitchess* motions seek information about past complaints by third parties of excessive force, violence, dishonesty, or the filing of false police reports contained in the officer's personnel file. (See e.g., *People v. Fuiava* (2012) 53 Cal.4th 622, 646 [discovery motion sought complaint of unnecessary acts of aggressive behavior, acts of violence and/or attempted violence, or acts of excessive force and/or attempted excessive force]; *Galindo v. Superior Court* (2010) 50 Cal.4th 1, 7 [prior incidents involving excessive force, violence, false arrest, fabrication or dishonesty]; *Chambers v. Superior Court* (2007) 42 Cal.4th 673, 677 [excessive force, aggressive conduct, unnecessary violence, unnecessary force, false arrest or detention, false statements in reports, false claims of probable cause or reasonable suspicion or any other evidence of, or complaints of dishonesty].) Thus, once a defendant has made the relatively low threshold showing of good cause and the court has reviewed the pertinent documents in

15

camera, the court releases the contact information of the third party complainant and potential witnesses to the past alleged misconduct. (*Haggerty v. Superior Court* (2004) 117 Cal.App.4th 1079, 1089-1090.) On those occasions when that information proves insufficient, either because a witness does not remember the earlier events or the witness cannot be located, a supplemental *Pitchess* motion may be filed and the statements of the witnesses may be disclosed to the defendant. (*Carruthers v. Municipal Court* (1980) 110 Cal.App.3d 439, 442; *Kelvin L. v. Superior Court* (1976) 62 Cal.App.3d 823, 828–829.)

In *Alvarez v. Superior Court*, *supra*, 117 Cal.App.4th 1107 (*Alvarez*), a defendant filed a *Pitchess* motion to discover complaints of excessive violence involving several deputy sheriffs, including a Deputy Etter. The trial court granted the motion and ordered disclosure of the fact that a Deputy Summer had lodged a complaint against Deputy Etter alleging " 'workplace violence.' " (*Id.* at p. 1109.) However, Deputy Summer refused to discuss the complaint with defense counsel's investigator. The defendant then filed a supplemental *Pitchess* motion seeking statements made by Deputy Summer with respect to his complaint against Deputy Etter. The supplemental motion supported by a declaration from the defendant's counsel, based upon information and belief that Deputy Summer did not want to discuss the incident. Counsel argued that the deputy's refusal to discuss the incident was the functional equivalent of being unavailable to discuss the incident, thereby entitling him to the deputy's statements. (*Id.* at p. 1110.)

The trial court denied the supplemental motion. It held the deputy's refusal to cooperate did not make him unavailable so as to permit disclosure of the statements he had made. Thereafter, the defendant sought a writ of mandate from the Court of Appeal. Initially, the Court of Appeal denied the petition *without prejudice.* The order explained: " 'The May 16, 2003 declaration of counsel, made "on information and belief," lacks adequate foundation to establish the unavailability of the witness [Deputy Summer] or

16

otherwise demonstrate good cause for the requested supplemental discovery. [Citation.]' " (*Alvarez*, *supra*, 117 Cal.App.4th at p. 1110.)[5]

Our review of the defense counsel's sealed declaration convinces this court that the trial court's ruling was correct. The declaration of counsel, made on information and belief, lacked an adequate foundation to establish the unavailability of the witnesses. (*Alvarez*, *supra*, at p. 1110.)

Even if we were to conclude that defense counsel's sealed declaration was adequate to establish the unavailability of the witness, we would not remand for further proceedings. We note that the one witness that defense counsel stated could not be found subsequently testified at the Evidence Code section 402 hearing as outlined *ante*.

IV. Alleged Instructional Error

At trial, the prosecution's theory of liability as to count two was that appellant resisted, delayed or obstructed Officer Rapp while the officer was engaged in the lawful performance of his duties, by fleeing when the officer told him to stop.

Defense counsel requested that the court instruct the jury pursuant to CALCRIM No. 2670. Relevant to this argument CALCRIM No. 2670 provides "The People have the burden of proving beyond a reasonable doubt that *<insert name, excluding title>* was lawfully performing (his/her) duties as a peace officer. If the People have not met this burden, you must find the defendant not guilty of *<insert name[s] of all offense[s] with lawful performance as an element>*. [¶] A peace officer is not lawfully performing his or her duties if he or she is (. . . using unreasonable or excessive force when making or attempting to make an otherwise lawful arrest or detention)."

---

[5]   Ultimately, after trial court proceedings resumed, the defendant filed a new supplemental *Pitchess* motion for Deputy Summer's statements. This time the motion was supported by a declaration from the investigator. He averred that Deputy Summer had refused to speak with him about the complaint he had filed against Deputy Etter. After the trial court denied the motion, the defendant again petitioned for a writ of mandate, which the Court of Appeal granted. (*Alvarez*, *supra*, at pp. 1110, 1115.)

Defense counsel's position was that a reasonable jury could find that Officer Rapp engaged in the exercise of excessive force when he drew his firearm and then his Taser in attempting to apprehend appellant. The trial court denied the request to read CALCRIM No. 2670; the court concluded that it was unaware of any facts or case law indicating that the drawing of a weapon or Taser was excessive force.[6]

Appellant asserts that the court's ruling was incorrect and denied him his state and federal due process rights to have the prosecution prove every element of the charged offense beyond a reasonable doubt. We are not persuaded by appellant's arguments that the trial court was incorrect.

At the outset we note that contrary to appellant's argument, the jury was properly instructed on the elements of resisting arrest. "The legal elements of a violation of section 148, subdivision (a) are as follows: (1) the defendant willfully resisted, delayed, or obstructed a peace officer, (2) when the officer was engaged in the [lawful] performance of his or her duties, and (3) the defendant knew or reasonably should have known that the other person was a peace officer engaged in the performance of his or her duties. [Citations.]" (*People v. Simons* (1996) 42 Cal.App.4th 1100, 1108–1109.) The jury was so instructed with CALCRIM No. 2656. Specifically, the jury was instructed that to prove appellant resisted arrest, "the People must prove that: [¶] 1. Brandon Rapp was a peace officer lawfully performing or attempting to perform his duties as a peace officer; [¶] 2. The defendant willfully resisted or obstructed or delayed Brandon Rapp in the performance or attempted performance of those duties; [¶] AND [¶] 3. When the

---

[6]     The court instructed the jury pursuant to CALCRIM No. 2565 on the elements of resisting, obstructing or delaying a peace officer in the performance of his duties. However, the court did not read the last paragraph of that instruction, which provides "A peace officer is not lawfully performing his duties if he is using unreasonable or excessive force in his duties. Instruction 2670 explains when force is unreasonable or excessive."

18

defendant acted he knew or reasonably should have known that Brandon Rapp was a peace officer performing or attempting to perform his duties."

A claim of instructional error is reviewed de novo. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569–570.)

"A trial court must give a requested instruction *only* if it is supported by substantial evidence, that is, evidence sufficient to deserve jury consideration. [Citations.]" (*People v. Marshall* (1997) 15 Cal.4th 1, 39-40, italics added.) However, the California Supreme Court has stressed, " 'unsupported theories should not be presented to the jury.' [Citation.]" (*Id.* at p. 40.)

CALCRIM No. 2656 provides as follows: "The defendant is charged [in Count ___] with (resisting[,]/ [or] obstructing[,]/ [or] delaying) a (peace officer/public officer/emergency medical technician) in the performance or attempted performance of (his/her) duties [in violation of Penal Code section 148(a)].

To prove that the defendant is guilty of this crime, the People must prove that:

1. <*insert name, excluding title*> was (a/an) (peace officer/public officer/emergency medical technician) lawfully performing or attempting to perform (his/her) duties as a (peace officer/public officer/emergency medical technician);

2. The defendant willfully (resisted[,]/ [or] obstructed[,]/ [or] delayed) <*insert name, excluding title*> in the performance or attempted performance of those duties;

AND

3. When the defendant acted, (he/she) knew, or reasonably should have known, that <*insert name, excluding title*> was (a/an) (peace officer/public officer/emergency medical technician) performing or attempting to perform (his/her) duties.

Someone commits an act *willfully* when he or she does it willingly or on purpose. It is not required that he or she intend to break the law, hurt someone else, or gain any advantage. [A person who is employed as a police officer by <*insert name of agency that employs police officer*> is a *peace officer*.]"

19

The instruction goes on to say, "<*When lawful performance is an issue, give the following paragraph and Instruction 2670, Lawful Performance: Peace Officer.*> [A peace officer is not lawfully performing his or her duties if he or she is (unlawfully arresting or detaining someone/ [or] using unreasonable or excessive force in his or her duties). Instruction 2670 explains (when an arrest or detention is unlawful/ [and] when force is unreasonable or excessive).]"

The bench notes to CALCRIM No. 2656 indicate that the above cited bracketed portion of the instruction be given "If lawful performance is an issue . . . ." In which case, the court should give "CALCRIM No. 2670, Lawful Performance: Peace Officer"

Here, the trial court correctly determined that the evidence did not support the instruction requested by the defense and therefore should not be given.

Our review of the record here reveals no evidence of the use of excessive force by Officer Rapp, much less substantial evidence. The evidence showed that Officer Rapp un-holstered his gun, but carried it at his side as he ordered appellant to stop; he never lifted the gun to point it at appellant and holstered the gun as he chased after appellant. At some point during the chase he took out his Taser, but there was no evidence that he ever deployed the Taser; in fact Officer Rapp testified that he was not sure if the Taser would work at the "range [h]e was at." An officer's drawing of his or her weapon and order for a person who is suspected of committing a crime to stop does not necessarily constitute excessive force. (See *Jackson v. Sauls* (11th Cir. 2000) 206 F.3d 1156, 1171-1172 [an officer's drawing of a weapon on a lawfully detained suspect does not necessarily constitute excessive force].) Further, there was no evidence that Officer Rapp actually pointed the gun at appellant. (*Compare, e.g., Robinson v. Solano Cnty.* (9th Cir. 2002) 278 F.3d 1007, 1013–1015 (en banc) [officers' use of drawn gun at close range, pointed at head of apparently unarmed misdemeanor suspect, was actionable as excessive force]; *Baldwin v. Placer Cnty.* (9th Cir. 2005) 418 F.3d 966, 970 [pointing weapons and pushing plaintiff could constitute excessive force].)

20

Appellant cites no case, and we can find none, in which an officer was found to have used excessive force merely by holding a gun at his or her side while chasing a suspected drug dealer late at night, or by chasing that suspect with Taser in hand, but never using it.

The trial court's ruling was correct.

*V. Alleged Punishment for Exercising Right to go to Trial*

Appellant contends that the court improperly punished him for exercising his right to go to trial by imposing a longer sentence than the one offered as part of a plea bargain. He asserts that the court offered him a three-year sentence if he pleaded guilty prior to trial, but imposed a nine-year sentence after he was convicted by the jury.

A defendant may not be penalized for exercising his or her jury trial right, which is a violation of Fourteenth Amendment due process rights. (*In re Lewallen* (1979) 23 Cal.3d 274, 278 (*Lewallen*); *People v. Collins* (2001) 26 Cal.4th 297, 306–307.) " '[A] court may not offer any inducement in return for a plea of guilty or nolo contendere. It may not treat a defendant more leniently because he foregoes his right to trial or more harshly because he exercises that right.' " (*People v. Clancey* (2013) 56 Cal.4th 562, 575, quoting *People v. Superior Court* (*Felmann*) (1976) 59 Cal.App.3d 270, 276.)

Although a court may not impose a harsher sentence on a defendant as punishment for exercising his or her jury trial right, "[t]here must be some showing, properly before the appellate court, that the higher sentence was imposed as punishment for exercise of the right." (*People v. Angus* (1980) 114 Cal.App.3d 973, 989–990.) In *Lewallen, supra,* 23 Cal.3d at page 274, the defendant refused to accept a negotiated sentence. Following a jury trial, at sentencing, the defense attorney requested informal rather than formal probation. (*Id*. at p. 276.) The trial court responded: " 'I think I want to emphasize there's no reason in having the District Attorney attempt to negotiate matters if after the defendant refuses a negotiation he gets the same sentence as if he had accepted the negotiation. It is just a waste of everybody's time, and what's he got to lose. And as far

21

as I'm concerned, if a defendant wants a jury trial and he's convicted, he's not going to be penalized with that, but on the other hand he's not going to have the consideration he would have had if there was a plea.' " (*Id.* at p. 277.)  The Supreme Court remanded the matter for resentencing, finding that the defendant had shown "that the trial court's exercise of its sentencing function was improperly influenced by his refusal of the proffered plea bargain and insistence on his right to trial." (*Ibid.*)

*Lewallen* emphasized "that a trial court's discretion in imposing sentence is in no way limited by the terms of any negotiated pleas or sentences offered the defendant by the prosecution.  The imposition of sentence within the legislatively prescribed limits is exclusively a judicial function." (*Lewallen, supra,* 23 Cal.3d at p. 281.)  "Legitimate facts may come to the court's attention either through the personal observations of the judge during trial [citation], or through the presentence report by the probation department, to induce the court to impose a sentence in excess of any recommended by the prosecution." (*Ibid*., fn. omitted.)  "The mere fact . . . that following trial defendant received a more severe sentence than he was offered during plea negotiations does not in itself support the inference that he was penalized for exercising his constitutional rights." (*People v. Szeto* (1981) 29 Cal.3d 20, 35.)

Appellant has failed to present any evidence that the higher sentence was imposed as punishment for the assertion of his jury trial right.

During the sentencing hearing, defense counsel argued that appellant was offered three years before trial and "nothing presented at this trial . . . made this case more aggravated or serious than what we knew pretrial."  Counsel stated that it was the defense position that appellant "should not be punished for exercising his right to go to trial."  After appellant urged the court to impose a "program rather than a lengthy sentence" so that he could "be that man this society needs me to be[,]" the trial court stated "I would welcome you becoming a productive member of society.  [¶]  And, unfortunately, looking at your history that's going to be difficult.  [¶]  I think it is quite relevant that you started

22

selling crack cocaine when you were 14 years old.  And at some point you went to juvenile court, juvenile hall for drug sales.  [¶]  When you were released you began selling crack again.  [¶]  You went to CYA.  [¶]  And when you were released from there you came back to San Jose because you heard there was a lot of crack and it was easy to sell.  [¶]  And you were arrested for drug sales and sent to state prison.  [¶]  And you continue to sell crack.  And there's simply nothing in your history that gives me any reason to grant leniency in this case.  [¶]  I am not punishing you for exercising your right to go to trial."

Nothing in the foregoing indicates to this court that the sentence imposed was punishment for appellant's exercise of his jury trial right.  To the contrary, the trial court relied on proper factors in sentencing appellant to the aggravated term.  (Cal. Rules of Court, rule 4.421, subd. (b).)  The court based its decision on appellant's extensive criminal history, which was detailed in the probation officer's report.[7]  As noted, a trial court may impose a higher sentence based on "[l]egitimate facts [which] may come to the court's attention either through personal observations of the judge during trial [citation], or through the presentence report by the probation department . . . ."  (*Lewallen*, *supra*, 23 Cal.3d at p. 281.)

Since the record supports the conclusion the court based its sentencing decision on the new information revealed in the probation report, we find no evidence that the court was punishing appellant for going to trial.

---

[7]     The probation officer's report listed three circumstances in aggravation: the defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness; the defendant had served a prior prison term; and the defendant's prior performance on probation or parole was unsatisfactory.  There were no circumstances in mitigation.

23

*VI. Probation Supervision Fee*

In sentencing appellant, the court imposed a "probation supervision fee" in the amount of $110.  Appellant argues that we must strike the fee because he is not going to be on probation, rather he is going to be subject to mandatory supervision pursuant to Penal Code section 1170, subdivision (h)(5)(B)(i).  The Attorney General agrees that the fee was imposed erroneously.

In order to determine whether the ordered fee for mandatory supervision is authorized, we are required to interpret the language of Penal Code sections 1170, subdivision (h)(5)(B)(i), and 1203.1b.  " 'When construing a statute, we must "ascertain the intent of the Legislature so as to effectuate the purpose of the law." ' [Citations.] '[W]e begin with the words of a statute and give these words their ordinary meaning.' [Citation.]  'If the statutory language is clear and unambiguous, then we need go no further.' [Citation.]  If, however, the language supports more than one reasonable construction, we may consider 'a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.' [Citation.]  Using these extrinsic aids, we 'select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.' " (*People v. Sinohui* (2002) 28 Cal.4th 205, 211–212.)

As to probation supervision costs, Penal Code section 1203.1b provides, "in any case in which a defendant is granted probation . . .  the probation officer . . . shall make a determination of the ability of the defendant to pay all or a portion of the reasonable cost of any probation supervision . . . ."  (Pen. Code, § 1203.1b, subd. (a).)  In addition, "[t]he court shall order the defendant to pay the reasonable costs if it determines that the

defendant has the ability to pay those costs based on the report of the probation officer . . . ." (*Id.,* subd. (b).) As noted, Penal Code section 1170, subdivision (h)(5)(B)(i) (hereafter section 1170(h)(5)(B)(i)) provides that when the defendant is under mandatory supervision, "the defendant *shall be supervised by the county probation officer in accordance with* the terms, conditions, and procedures generally applicable to persons placed on probation . . . ." (Italics added.) We believe that the language of section 1170(h)(5)(B)(i) pertains to the *nature and manner of supervision by the probation officer over the defendant* —in other words, the nature and manner of the supervision itself—but that the language does not authorize the imposition of *supervision costs* under section 1203.1b to persons placed on mandatory supervision.

Several considerations support this construction of section 1170(h)(5)(B)(i). First, probation supervision costs are considered collateral to a grant of probation, and therefore we are reluctant to construe broadly the language of section 1170(h)(5)(B)(i) as authorizing the imposition of supervision *costs* in mandatory supervision cases. Penal Code former sections 1203 and 1203.1 long authorized trial courts to require the payment of certain items, such as fines and financial reparation and restitution, in proper cases as conditions of probation. (E.g., *People v. Lippner* (1933) 219 Cal. 395, 398; *In re McVeity* (1929) 98 Cal.App. 723, 726; *People v. Baker* (1974) 39 Cal.App.3d 550, 559 (*Baker*).) Under this former statutory scheme, however, the *Baker* court concluded that the trial court was *not* authorized to impose a probation condition requiring the defendant to pay for the costs of either his probation supervision or his prosecution. (*Baker*, *supra*, 39 Cal.App.3d at pp. 559-560.) The *Baker* court observed that "[j]urisdictions that permit imposition of such costs generally do so under the explicit authority of statute" and concluded that Penal Code "section 1203.1 explicitly authorizes the imposition of only limited fines as part of probation, which in turn should be oriented towards rehabilitation of the defendant and not toward the financing of the machinery of criminal justice." (*Baker*, *supra*, at p. 559.) After *Baker,* "the Legislature enacted Penal Code section

25

1203.1b which permits the trial court to require a defendant to reimburse probation costs if the court determines, after hearing, that the defendant has the ability to pay all or a portion of such costs." (*People v. Bennett* (1987) 196 Cal.App.3d 1054, 1056, italics omitted (*Bennett* ); *People v. Washington* (2002) 100 Cal.App.4th 590, 595.)

Subsequently, courts have held that the payment of probation costs under Penal Code section 1203.1b may not be made a condition of probation because such costs are *collateral* to granting probation. (*Bennett, supra,* 196 Cal.App.3d at pp. 1056–1057; *People v. Hart* (1998) 65 Cal.App.4th 902, 906–907; *Brown v. Superior Court* (2002) 101 Cal.App.4th 313, 321; *People v. Pacheco* (2010) 187 Cal.App.4th 1392, 1401, 1402, overruled on other grounds by *People v. McCullough* (2013) 56 Cal.4th 589, 599.) In view of the collateral nature of probation supervision costs, we are reluctant to construe broadly the language in section 1170(h)(5)(B)(i), which concerns the *nature and manner of supervision* by the probation officer over the defendant in a mandatory supervision case, to include the authority of a court to impose the *costs* of mandatory supervision on a defendant.

Second, subsequent to the amendment that added the language at issue in section 1170, the Legislature amended two other Penal Code sections to expressly provide that a particular fine and a particular cost are applicable to mandatory supervision cases, even though similar amounts are already applicable to probation cases. In particular, although Penal Code section 1202.44 already provides for the imposition of a suspended probation revocation restitution fine whenever probation is imposed, the Legislature amended Penal Code section 1202.45 to require the imposition of a suspended "mandatory supervision revocation restitution fine" in every case where a person is subject to mandatory supervision under section 1170, subdivision (h)(5)(B)(i). (Pen. Code, § 1202.45, subd. (b).) In addition, the Legislature amended Penal Code section 1203.9, which provides for the intercounty transfer of probation cases and the payment of costs for processing a transfer, to include mandatory supervision cases. (Pen. Code, § 1203.9, subds. (a) & (d).)

26

These subsequent amendments by the Legislature to provide for the payment of certain items by defendants in mandatory supervision cases, where those payments are already authorized in probation cases, suggest that the language in section 1170(h)(5)(B)(i) should not be broadly construed to include the authority of a court to impose the costs of mandatory supervision on a defendant under Penal Code section 1203.1b. In light of these subsequent amendments, we must presume the Legislature would have provided that supervision costs under Penal Code section 1203.1b must be borne by defendants in mandatory supervision cases if the Legislature had so intended. If the Legislature intends that supervision costs under Penal Code section 1203.1b be borne by defendants in mandatory supervision cases, respectfully, we suggest that the Legislature make that intent clear in the statutory language.

Finally, a prior version of Penal Code section 1170 provided that a defendant's sentence may include "a period of county jail time and a period of *mandatory probation* not to exceed the maximum possible sentence." (Stats. 2011, ch. 39, § 27, eff. June 30, 2011, operative Oct. 1, 2011, italics added.) Before this prior version became operative, section 1170 was amended to delete the reference to "mandatory probation" and to include the language now at issue concerning a concluding portion of the sentence where the defendant is "supervised by the county probation officer in accordance with the terms, conditions, and procedures generally applicable to persons placed on probation." (Stats. 2011–2012, 1st Ex. Sess., ch. 12, § 12, eff. Sept. 21, 2011, operative Oct. 1, 2011; Stats. 2011, ch. 361, § 6.7, eff. Sept. 29, 2011, operative Oct. 1, 2011.) The change in the reference to the latter portion of a defendant's sentence—from probation to supervision by a probation officer—suggests that the Legislature did not intend probation and mandatory supervision to be interchangeable or otherwise identical in all respects.

Based on the foregoing considerations, and the language of Penal Code sections 1170(h)(5)(B)(i) and 1203.1b, we conclude that the ordered monthly supervision fee of $110 is not authorized.

*Disposition*

We strike the order that appellant pay a supervision fee of $110.  As so modified, the judgment is affirmed.

_____

ELIA, J.

WE CONCUR:

_____

RUSHING, P. J.

_____

PREMO, J.

| Trial Court: | Santa Clara County Superior Court |
| --- | --- |

| Trial Judge: | Hon. Joyce Allegro |
| --- | --- |

| Attorney for Appellant: | Emry J. Allen, Under Appointment By the Court of Appeal |
| --- | --- |

| Attorneys for Respondent: | Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Sr. Assistant Attorney General, Masha Dabiza, Alisha M. Carlile and Michael Chamberlain, Deputy Attorneys General |
| --- | --- |

*People v. Ghebretensae*

H038123