Filed 6/29/16  P. v. Bertran CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>ALAN BERTRAN,<br><br>     Defendant and Appellant. | B266448<br><br>(Los Angeles County<br>Super. Ct. No. LA079249) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Michael V. Jesic, Judge.  Affirmed as modified.

James Koester, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Marc A. Kohm and Paul S. Thies, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Alan Bertran (Bertran) was convicted of committing assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)).[1] On appeal, he contends that the trial court committed error by refusing to give a self-defense instruction. Upon review, we find no instructional error. Bertran argues, and the People concede, that he was entitled to 921 days of presentence credit rather than 530 days. We modify the judgment accordingly. As modified, the judgment is affirmed.

## FACTS

### Prosecution Evidence

Narek Manukyan (Manukyan) testified that he drove home from work at about 4:00 p.m. on March 28, 2014, parked and heard loud cursing. He noticed Bertran sitting on the stairs in front of a building across the street. Bertran was holding a 40-ounce beer bottle that was 75 percent full.

Manukyan walked to within five to seven feet of Bertran to say hello and introduce himself, and to offer assistance. In response, Bertran asked if Manukyan was "Armenian or some shit." Bertran stood up and wobbled, as though intoxicated. Manukyan offered Bertran a cigarette, who said, "I don't want your shit." But then Bertran tried to snatch the pack away, and Manukyan had to pull it back. At that point, Manukyan was concerned for his safety, so he turned around and walked away. Something hit the right side of Manukyan's forehead, and he fell. He noticed that he was bleeding from a head wound; he saw shards of glass on the ground and smelled beer.

Manukyan did not have a weapon.

According to Manukyan, he turned over onto his back to see Bertran yelling at him from two to three feet away. Manukyan got up. Bertran approached as though trying to fight, so Manukyan held out a hand and then ran inside a nearby apartment complex. As Manukyan looked for a place to hide, he heard Bertran screaming in a loud, angry voice. The police eventually arrived.

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

2

Lori Brill (Brill) testified that she heard breaking glass and looked out her apartment window. She saw Bertran and Manukyan "rolling around" on the ground. She did not see any kicks or punches. Neither man had a weapon. Manukyan was trying to get away. He stood up and ran toward an apartment building, at which point he disappeared from her sight. Bertran went the same direction. Fifteen or 20 minutes later, she was in her apartment building garage and saw Bertran walk by. He was agitated and talking to himself, saying, "This is not the last time you're going to see [me]. I'm not done with you."

A 911 call from 4:21 p.m. on the same day as the incident was played for the jury.[2] The caller was not identified and did not testify at trial. She stated that "[t]here's this crazy guy running up and down the street, screaming at everybody, and I don't know if he has a gun or what. . . . Um, he's running up and down the street screaming. He just beat the . . . crap out of some guy." A moment later, the caller said, "He['s] just getting so wild, but then he started making his way down the street. I don't know if he beat 'em with a glass, or if it was a gun, or what." When asked why the caller thought it might be a gun, she said, "Because we heard a big boom, and then I seen something in the sky." The 911 operator asked if the caller saw a weapon in the attacker's hand. In response, she said, "No, but I thought I seen one in the other guy's hand—the guy that he was attacking."

The caller said, "We heard someone screaming for a long time, like, 'F you mother F'ers. F this, bitch. . . . [W]e didn't know where it was coming from, but it was getting louder and louder. . . . [A]nd, all of a sudden, that guy was walking down the street . . . [and] he's like 'Where you from, homey?' and the guy was like, 'What the hell?' And the guy was trying to get away from him, and he . . . would . . . let him go. And the guy ran across the street, . . . and the guy started running after him." The caller "heard a big pop, or something," and when the caller looked, "he was beating the guy up, dragging him on the floor, right in front."

---

[2]     The 911 caller gave a female name. For purposes of this opinion, we presume the 911 caller was female.

3

Los Angeles Police Department Officer Cameron Gobble and his partner responded to the scene and detained Bertran. Bertran was carrying a softball-sized rock. He had no visible injuries.

**Defense Evidence**

The defense did not call any witnesses.

**Ruling On Bertran's Request For A Self-Defense Instruction**

Defense counsel requested a self-defense instruction due to the testimony that Bertran and Manukyan were fighting.

The trial court stated that the "evidence in this case was that the victim was assaulted and . . . the only evidence we have is that he was trying to get away from [Bertran]. There's no evidence that we've heard, competent evidence, to show that [Bertran] was ever defending himself."

According to defense counsel, Manukyan provoked Bertran by getting into his space even though he was obviously troubled. Defense counsel stated, "You can't tell me that some of those jurors can't believe that [Manukyan] sought out to provoke [Bertran] and almost pick a fight." The trial court replied, "[A]ll we've heard was the provocation was offering him a cigarette and asking him if he was okay. That is different than someone doing something that would lead someone to need to defend themselves." At that point, defense counsel suggested that invading the space of a "crazy" person is provocation, and that Bertran may have actually believed that he had to defend himself.

The trial court stated, "It can't be just [you] saying in my client's mind [he thought he needed to defend himself][.] [T]here needs to be substantial evidence of that. And I haven't heard that evidence. So at this time I am not inclined to give either imperfect self-defense, which is if the defendant truly believe he needed to defend himself [even if] a reasonable person wouldn't[,] or perfect self-defense, which a reasonable person would believe at that time they needed to defend themselves[.]"

Because the 911 caller thought she saw a weapon, defense counsel said maybe Bertran "thought" Manukyan had a weapon. Defense counsel asked if she would be

4

allowed to make that argument to the jury. The trial court said "[t]hat's not what we're discussing right now." It later reiterated that it was denying a self-defense instruction.

*Trial On Alleged Priors*

The trial court found true allegations in the information that Bertran suffered two prior convictions for serious felonies within the meaning of the "Three Strikes" law (§§ 667, subds. (a)(1) & (d), 1170.12, subd. (b)), and that he suffered two prior prison sentences (§ 667.5, subd. (b)).

*Sentencing*

Bertran received a third strike sentence of 25 years to life in prison for assault with a deadly weapon. In addition, he was given two five-year enhancements pursuant to section 667, subdivision (a)(1). The trial court used its discretion not to impose one-year enhancements pursuant to section 667.5, subdivision (b). Bertran's total sentence was 35 years to life in prison. He was given 461 days of actual custody credit, and 69 days of worktime credit.

This appeal followed.

## DISCUSSION

## I. The Trial Court Properly Refused a Self-Defense Instruction.

Bertran argues that the trial court was required to instruct the jury on self-defense because the 911 caller thought she saw a weapon "in the other guy's hand." A claim of instructional error is reviewed de novo. (*People v. Ghebretensae* (2013) 222 Cal.App.4th 741, 759.)

"[A] defendant acts in lawful self-defense if 'one, the defendant reasonably believed that he was in imminent danger of suffering bodily injury . . . or was in imminent danger of being touched unlawfully; two, the defendant reasonably believed that the immediate use of force was necessary to defend against that danger; and three, the defendant used no more force than was reasonably necessary to defend himself against that danger.' [Citation.]" (*People v. Clark* (2011) 201 Cal.App.4th 235, 250; § 693.) A trial court must instruct on self-defense if it is supported by substantial evidence. (*In re Christian S.* (1994) 7 Cal.4th 768, 783.)

The testimony of Manukyan and Brill established that Bertran was the aggressor, and gave chase when Manukyan tried to get away. Manukyan and Brill both testified that Manukyan did not have a weapon. Contrary to what Bertran says, there was no contradicting evidence. The 911 caller said she thought the "victim" had a weapon. For the following reasons, that is not substantial evidence that Manukyan was armed. The 911 caller did not testify and identify Bertran and Manukyan as the combatants she saw engaged in an altercation. Thus, she might have witnessed two different combatants. Or, she may have witnessed Bertran fighting with a third person.

Even if Manukyan had a weapon, the 911 caller did not describe the supposed weapon, or whether it was visible before Bertran attacked Manukyan. As a result, the jury did not have sufficient evidence from which it could have inferred that Manukyan exhibited a weapon and posed an immediate danger of bodily harm, Bertran reasonably believed he needed to defend himself, only then did Bertran attack, and his use of force was reasonable. Further, the fact that Bertran chased after Manukyan suggests that Bertran did not believe Manukyan posed a danger.

There is no evidence suggesting that Bertran reasonably believed he needed to defend himself by hitting Manukyan in the head with a bottle. The trial court properly refused to instruct on self-defense.

## II.  Worktime Credit.

Bertran was awarded 461 actual days of presentence custody credit, and 69 days of worktime credit. In other words, he was awarded worktime credit totaling 15 percent of his actual days of presentence custody credit. In limiting Bertran's worktime credit to 15 percent, the trial court impliedly relied on section 2933.1. According to Bertran, this was error. Though he did not raise the issue below, the issue is properly raised on appeal as an aside to other appellate issues. (*People v. Acosta* (1996) 48 Cal.App.4th 411, 427 [appellant may raise issue of presentence conduct credits for the first time on appeal when he or she properly raises other issues].)

Section 2933.1, subdivision (a) provides that a person who is convicted of a felony listed in subdivision (c) of section 667.5 "shall accrue no more than 15 percent of

6

worktime credit[.]"  Section 667.5, subdivision (c) defines "violent felony" for purposes of the section by listing specific crimes as well as some catchall categories.  One of the catchall categories is "[a]ny felony punishable by death or imprisonment in the state prison for life."  (§ 667.5, subd. (c)(7).)

Assault with a deadly weapon is not listed as one of the specific violent felonies.  However, because Bertran was sentenced under the Three Strikes law to 25 years to life, the question is whether his three strikes sentence converted his crime into a felony punishable by a life sentence for purposes of the catchall in section 667.5, subdivision (c)(7).  That question was resolved by *People v. Thomas* (1999) 21 Cal.4th 1122, 1130, which held that "sections 2933.1 and 667.5[, subd.] (c)(7) limit a defendant's presentence conduct credit to a maximum of 15 percent only when the defendant's current conviction is itself punishable by life imprisonment, not when it is so punishable solely due to his status as a recidivist."

Because section 2933.1 does not apply, the trial court should have awarded presentence conduct credits under section 4019.  Section 4019, subdivision (a)(4) provides that the section applies when "a prisoner is confined in a county jail, industrial farm, or road camp, or a city jail, industrial farm, or road camp following arrest and prior to the imposition of sentence for a felony conviction."  Bertran falls within this definition.  Under section 4019, subdivision (f), a "term of four days will be deemed to have been served for every two days spent in actual custody."

Applying this formula, Bertran and the People agree that he was entitled to 921 days of presentence custody credit.

**DISPOSITION**

The judgment is modified to reflect that Bertran was awarded 461 days of actual custody credit plus 460 days of worktime credit for a total credit of 921 days. As modified, the judgment is affirmed. The trial court is directed to correct the abstract of judgment accordingly.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
             ASHMANN-GERST


We concur:


_____, P. J.
      BOREN


_____, J.
      HOFFSTADT

8