Filed 2/3/16  P. v. Werntz CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>KRISSY LYNN WERNTZ,<br><br>    Defendant and Appellant. | D069075<br><br><br>(Super. Ct. No. INF066465) |

APPEAL from a judgment of the Superior Court of Riverside County, Harold W. Hopp, Judge.  Affirmed, with directions.

Siri Shetty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and Jason Michael Hann (Hann) had three children together:  Jason Michael Hann (Jason), Montana Jean Hann, and Jason Michael Hann (Michael).  A jury

convicted defendant of the second degree murder of 10-week-old Montana, whom prosecutors argued had been beaten to death either by defendant as a direct perpetrator, or by Hann with defendant being guilty under an implied malice or aiding and abetting theory.[1] To establish defendant had the knowledge and intent required to be found guilty other than as a direct perpetrator, the People moved to introduce evidence that Hann had previously beaten Jason to death, and had subsequently beaten Michael severely (though not fatally). The trial court granted the motion and instructed the jury that the People need only prove the other acts by a preponderance of the evidence. Defendant contends the trial court erred by admitting the evidence and by instructing the jury with the preponderance standard of proof instead of the reasonable doubt standard. She further contends the prosecutor engaged in misconduct during closing argument by misstating the law regarding aider and abettor liability. We reject these contentions and affirm.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

The badly decomposed remains of 10-week-old Montana were found in February 2002 after being abandoned in a storage facility in Arkansas four months earlier. This discovery led police on a nationwide search for Montana's parents, and led to the discovery of the badly decomposed remains of six-week-old Jason, whose remains had

---

[1] Hann is not a party to this appeal.

[2] Because we find no error, we do not address defendant's additional claim of cumulative error. (See, e.g., *People v. Bennett* (2009) 45 Cal.4th 577, 618 ["With the exception of a single erroneous evidentiary ruling, which was harmless beyond a reasonable doubt, we have rejected all other claims of error; thus there is no cumulative error."].)

2

earlier been abandoned in a storage facility in Arizona in December 2000.  When police arrested defendant and Hann at a motel in Maine, Hann was holding one-month-old Michael, who had been severely beaten at least twice.

This appeal involves only defendant's conviction for murdering Montana. However, because evidence regarding Jason's death and Michael's abuse figured prominently in that conviction, we will present that evidence in some detail.  Although Montana is the only subject of defendant's prosecution and her remains were discovered first, we begin our factual summary with the evidence regarding Jason because he was murdered first.

*Jason*

Jason was born in Ohio on May 23, 1999.  He died in Vermont on July 4, 1999 (though his remains would not be discovered until April 23, 2002).  Defendant and Hann initially kept Jason's remains in a plastic container in the back seat of their car as they traveled the country.

In September 2000, Hann and defendant, who was pregnant, stayed in a pop-up trailer at a campground in New Hampshire.  They befriended Jean and Walter Steeves, who were staying at the neighboring campsite as they moved from New Hampshire to Florida.  They became close—"like family"—and ate dinner and sat around the campfire together almost every night.  Hann did most of the talking on his and defendant's behalf, but would look to defendant and ask, "Isn't that right, Krissy?"  During one conversation, Hann told the Steeveses they had lost a son, Jason, who died from "crib death."  When Hann asked defendant, "[i]sn't that right," she confirmed his statement.  (Defendant

3

would later tell police she thought Jason might have died from a spider bite while they were living in a tent in Vermont.) The Steeveses left the campground in October 2000; defendant and Hann left sometime thereafter.

On December 9, 2000 (just over a week after Montana was born), Hann rented a storage unit in Lake Havasu, Arizona, where he would leave the pop-up trailer. About 16 months later, on April 23, 2002 (the day after defendant and Hann were arrested in connection with Montana's death, discussed below), Mohave County Sheriff's deputies searched the trailer pursuant to a warrant. In a storage compartment beneath a bench in the trailer, deputies discovered Jason's decomposed remains inside a black nylon bag, which was wrapped in 17 plastic trash bags (with air fresheners placed in the ninth bag), all of which had been placed inside a plastic container. Jason's birth certificate and other paperwork left in the trailer connected the trailer to defendant and Hann.

Because authorities determined Jason had died in Vermont, his remains were sent there so the state's chief medical examiner could perform an autopsy. Due to the decomposition of Jason's remains, the autopsy could not detect any soft-tissue injuries. However, the autopsy revealed Jason had suffered a fractured rib adjacent to his spinal column at or near the time of death. The location of the fracture indicated inflicted trauma rather than accidental injury, and is "characteristic of abuse in which the child has been grabbed about the chest and abdomen . . . and, with pressure, being squeezed on the back and the front. This can occur in . . . shaking kinds of injuries or in which an infant is picked up and thrown against something." The medical examiner determined Jason's death was caused by "homicide by undetermined means."

4

*Montana*

Montana was born in Lake Havasu, Arizona on December 1, 2000. Hann called the Steeveses that day to tell them about Montana's birth and that they had named her Montana Jean after Jean Steeves. A few weeks later, defendant and Hann drove with Montana to Florida and stayed with the Steeveses for two weeks over the Christmas Holiday, leaving New Year's Day. After defendant, Hann, and Montana left the Steeveses' bound for California on January 1, 2001, Hann told the Steeveses he would call when they arrived. Neither Hann nor defendant ever called the Steeveses again (even after Montana's death).

Montana died about six weeks later, on February 10, 2001, in Desert Hot Springs, California (though her remains would not be discovered until February 18, 2002). Defendant and Hann kept Montana's remains in a plastic bag under the bed in their trailer.

On October 16, 2001, defendant and Hann rented a storage unit in Wynne, Arkansas (about two hours outside of Little Rock). After rent for the storage unit went unpaid, the storage facility auctioned off the contents of the unit, which included the pop-up trailer. B&D Transport (B&D) purchased the trailer at auction. On February 18, 2002, a B&D representative contacted police after he found Montana's remains while emptying the contents of a plastic container that had been in the trailer into a dumpster. Montana's hand was visible in the dumpster; her head and face were "completely encas[ed]" in several layers of duct tape.

The chief medical examiner at the Arkansas State Crime Laboratory performed an autopsy on Montana.[3] Her body was mostly decomposed, which limited the ability to observe soft tissue injuries. However, the autopsy revealed Montana suffered linear fractures through the entire thickness of both parietal bones of her skull (the bony plates on the top and sides of the skull). The fractures were caused by "severe blunt force." Because both parietal bones were broken, "[e]ither something struck [her] head on one side and then the other, or [she] was swung [such that her head impacted a hard surface] twice . . . ." The skull fractures showed no signs of healing.

Montana's left tibia was also fractured into two pieces. According to Dr. Kokes, this fracture was caused by bending or twisting the leg "in a manner similar [to] if you wanted to break a pencil." There was evidence of healing, which indicated the fracture was inflicted three to four weeks before Montana's death (when she was about six weeks old). External symptoms of this fracture (swelling and redness) would have been "obvious" to the naked eye, and it "inevitably" would have caused pain that resulted in "excessive" crying or fussiness.

Montana's lower left leg, near the ankle, exhibited periosteal thickening, indicating trauma short of a fracture. This condition would have been very painful, and could have caused swelling and redness.

---

[3]    The autopsy was performed by then-Chief Medical Examiner William Sturner, who has since retired. Then-Associate (now-Chief) Medical Examiner Charles Kokes observed portions of the autopsy and reviewed and signed the final autopsy report. Dr. Kokes testified at trial because of Dr. Sturner's advanced age and difficulty traveling.

Dr. Sturner consulted a forensic anthropologist to help determine Montana's age at the time of death. Their conclusion was consistent with the parties' stipulation that Montana was approximately 10 weeks old when she died.

Dr. Kokes concluded the cause of Montana's death was "homicidal violence by undetermined means." He identified three possible mechanisms of death: blunt force trauma to the head; blunt force trauma to the head, followed by wrapping with duct tape to ensure death by suffocation; and suffocation with duct tape, with the skull fractures being inflicted after death. Dr. Kokes opined the most likely mechanism was blunt force trauma to the head; the duct tape was likely used "to contain any blood or fluid or oozing that might have been taking place at that time, because there's no other reason to do that."

Inside the abandoned pop-up trailer, police found photographs of defendant and maps of several other states. They traced the trailer's New Hampshire license plate to Hann. Police sought arrest warrants for defendant and Hann, whom police suspected were no longer in Arkansas. The police contacted the owners of a nationwide motel chain, which issued a be-on-the-lookout for defendant and Hann. As a result, on April 22, 2002, police in Portland, Maine responded to a call informing them that defendant and Hann were staying at a motel there. While police were formulating a plan to get the suspects in custody without incident, defendant "ran into the police" as she approached a vending machine in the lobby. Police arrested her without incident. In an effort to get Hann out of the room, the motel clerk called him and told him defendant had twisted her ankle and they were going to call for medical help. Hann replied, " 'No, no, no. Don't do

7

that. I'll be right down and take care of it myself.' " When Hann exited his motel room holding one-month-old Michael, police took Michael and arrested Hann.

*Michael*

Police contacted the Maine Human Services Department, who placed Michael in the foster home of Jan R. within 12 to 15 hours of Hann's arrest. The first day of that placement, Jan observed Michael did not appear healthy—he was "flaccid"; he did not flail his arms or wiggle his feet; he did not cry loudly, but rather, mewed like a kitten; his eyes did not track objects well; and he appeared too thin. She based her observations on her experience raising two now-adult biological children, not on her experience as an adoptive or foster parent. Jan did not observe any physical injuries such as bruising or swelling. She immediately took Michael to a doctor.

Michael was admitted to the hospital on April 24, 2002. Staff noted he was lethargic, had poor tone, was not tracking well with his eyes, and appeared to be in pain upon movement. He had no external signs of trauma, no bruises, and no obvious injuries. However, X-rays revealed that Michael had 13 rib fractures. Evidence of healing suggested the fractures were one to two weeks old. Four bones in Michael's legs were also fractured near both knees and one ankle.

CT and MRI scans of Michael's head showed bleeding on the surface of the brain; subdural hematomas in various locations of at least two different ages (some days old, others a week or two old); bleeding into the brain tissue; and bruising of the brain itself. An ophthalmologist observed extensive hemorrhaging in multiple layers of Michael's retinas. A certified child abuse pediatrician opined these injuries were caused by violent

8

shaking on more than one occasion. He further opined these types of injuries would not have been observable if Michael's body had decomposed.

*Defendant's Statement to Portland Police*

Three days after her arrest, and after waiving her *Miranda* rights,[4] defendant spoke to Portland, Maine police officer Karl Rybeck about baby Michael. She told Rybeck that Michael had been born in West Virginia four weeks earlier. Neither defendant nor Hann had worked since. When Michael cried, defendant would hold him, walk with him, and try to rock him; sometimes defendant and Hann put Michael in a crib in the bathtub so they could close the bathroom door. Hann would turn the TV volume louder when he got mad at Michael for crying. Defendant stated she was Michael's primary caregiver when he cried. She claimed she never saw Hann harm or shake the baby, and denied doing so herself. With the exception of leaving to get meals or to go shopping, defendant said she, Hann, and Michael were always together. When confronted with Michael's injuries, defendant got emotional, acted "dumbfounded," and claimed she was unaware he had been hurt.

*Riverside County Sheriff's Investigation and Interview of Defendant*

In November 2004, the Riverside County Sheriff's Office was informed that Montana, whose remains were found in Arkansas, may have died in Riverside County in February 2001. Sergeant Gary LeClair reviewed police reports from Arkansas, Maine, Vermont, and Arizona, and searched for records establishing that defendant and Hann

---

4      *Miranda v. Arizona* (1966) 384 U.S. 436.

9

had lived in Riverside County during the relevant period. Sergeant LeClair obtained documents from a temporary employment agency showing defendant worked out of a Riverside County branch from January 31, 2001, through April 2001. The documents showed that defendant and Hann then moved throughout the country, returning to California in October and November 2001. Records showed defendant and Hann lived in a trailer park on the outskirts of Desert Hot Springs in Riverside County.

On March 1, 2005, Sergeant LeClair interviewed defendant about Montana's death.[5] Defendant stated she met Hann when she was 18 years old. Once they met, they were "unseparated." About one month after Montana was born in Arizona, they moved to a trailer park in California, where they all lived together in a 30-foot by 12-foot trailer. Once they left Arizona, Montana received no medical treatment. In the trailer, Montana usually slept in bed with defendant or Hann; sometimes she slept in the bathtub when she would not stop crying. Both parents fed Montana, but defendant often woke up at night to feed her. Hann changed the baby most of the time; defendant sometimes did. Defendant stated that when she was not working she spent a lot of time with Montana. Defendant claimed Montana was never injured before her death.

According to defendant, Montana died in the trailer on February 10, 2001. After working that morning at a woman's house in Palm Springs, defendant returned to the trailer park and was greeted by Hann outside the trailer saying, " 'I have to tell you

---

[5] LeClair interviewed defendant the day she was to be released from a Florida prison after serving a term for theft and check fraud offenses. The jury was informed the interview occurred in Florida, but not that defendant was incarcerated.

something.' "  Defendant entered the trailer and picked up Montana, who was laying in the bathtub.  Sergeant LeClair asked defendant, " 'What was Montana's condition when you picked her up?' "  Defendant responded, " 'She was fine.' "  Sergeant LeClair asked defendant, " 'Was she alive?' "  Defendant responded, " 'No, she wasn't alive.' "

Defendant stated that Montana was wrapped in a blanket and felt cold.  Defendant did not unwrap her.  Defendant did not call 911 or seek assistance from anyone; nor had Hann, a point on which defendant did not press him.  After sitting on the toilet holding Montana for a while, defendant left the trailer with Hann to stay at a motel, leaving Montana behind in the bathtub because defendant "didn't want to deal with it."

Defendant told Sergeant LeClair that Hann claimed he had put Montana in the bathtub with a bottle of milk and cereal, then left the trailer.  When he went back inside, Montana was dead and had "puke" around her mouth and face.  Defendant acknowledged she did not see any vomit on the baby.

When Sergeant LeClair asked defendant about the fact Montana died under similar circumstances to Jason, defendant said that nobody had shown her Montana's autopsy results, claiming " 'No one's ever told me anything.' "  She also stated she " 'thought maybe' " Jason had died from a spider bite while they were living in a tent in Vermont. She admitted she never examined Jason for evidence of a spider bite, and never called authorities following his death.  Instead, defendant and Hann kept his remains in a plastic container in the back seat of their car as they drove around the country.  They left Jason in a trailer at a storage facility in Arizona before moving to California.

11

Defendant put Montana's dead body in a bag so they could "[k]eep her longer," and kept it in a storage compartment under their bed in the trailer "so [she] can stay with them and she could sleep."

Defendant told Sergeant LeClair that Michael was born on March 21, 2002. She claimed Michael was in good health and had no injuries. Defendant, Hann, and Michael were together all the time, other than when defendant ran errands. No one other than defendant and Hann cared for him. Defendant claimed Hann was a good father, and she never saw him get violent with her children.

*Indictment, Trial, Jury Verdict, and Sentencing*

On September 14, 2009, the Riverside County District Attorney indicted defendant for the second degree murder of Montana (count 2). The People did not concede defendant was not the direct perpetrator, but the evidence at trial focused on the theory that defendant was guilty on an implied malice or aiding and abetting theory for neglecting her legal duty to protect Montana despite knowing Hann was abusing her. (See, e.g., *People v. Rolon* (2008) 160 Cal.App.4th 1206, 1209 ["[A] parent has a duty to protect his or her young child and may be criminally culpable on an aider and abettor theory for an assault causing death and on an implied malice theory for murder where the parent fails to take reasonably necessary steps for the child's protection, so long as the parent, with ability to do so, fails to take those steps with the intent of facilitating the perpetrator's assaultive offense."].)

12

The indictment also charged Hann with premeditated murder and child endangerment with respect to Montana (counts 1 and 3, respectively). The trial court severed the two cases.

In December 2013, the jury in Hann's case convicted him on both counts. Hann had already been convicted in 2006 of second degree murder for killing Jason in Vermont. The trial court in defendant's case took judicial notice of Hann's convictions and informed the jury of them.

On April 8, 2014, the jury—after deliberating for only 65 minutes—found defendant guilty of second degree murder. The trial court sentenced defendant to 15 years to life in state prison.[6]

## DISCUSSION

### I. *Admission of Evidence Regarding Jason and Michael*

Defendant contends the trial court erred by admitting evidence of Jason's death and Michael's injuries to establish she had the requisite knowledge and intent to be found guilty on an implied malice or aiding and abetting theory.

### A. *Background*

Before the trial court severed defendant's and Hann's cases, the People moved in limine to introduce evidence regarding Jason's death and Michael's injuries under

---

6    Paragraph 1 of the abstract of judgment correctly states defendant was convicted of murder under count 2. However, paragraph 6.a of the abstract erroneously states defendant's sentence relates to count 1, which relates to Hann. We will direct the trial court to amend the abstract of judgment to correct this error.

13

Evidence Code[7] sections 1101, subdivision (b) and 1109.[8] The People argued that the similarities between the facts involving the two other children and those of the charged offense were relevant to establish defendant's intent as a direct perpetrator (that is, to negate any claim of accidental injury) or, alternatively, to establish she had the requisite knowledge and intent to be liable on an implied malice theory or as Hann's aider and abettor. The People cited defendant's suggestion she was unaware of any abuse as "precisely the reason that the abuse and death of her other children is highly probative."

Defendant moved to exclude this evidence. She argued there was no evidence she had knowledge of the criminal nature of her children's deaths. She thought Jason had died of natural causes (a spider bite) and, in any event, Hann had subsequently confessed to killing him. She argued Michael's injuries were not sufficiently apparent to inform her he had been abused. She explained Jason and Montana were kept in plastic containers because defendant was "a grieving mother" who could not "bear to let them go." Even if

---

[7]     All further statutory references are to the Evidence Code unless otherwise specified.

[8]     Although character or propensity evidence is generally inadmissible under section 1101, subdivision (a) to prove a person's conduct on a specific occasion, evidence that a person committed a crime or other act may be admitted under section 1101, subdivision (b) (hereinafter, section 1101(b)) to prove some other material fact such as knowledge or intent. (See § 1101, subds. (a), (b); *People v. Leon* (2015) 61 Cal.4th 569, 597 (*Leon*).)
        Section 1109 generally allows evidence of prior acts of domestic violence to be admitted in a domestic violence case to prove a propensity to commit such acts. (See § 1109, subd. (a); *People v. Brown* (2000) 77 Cal.App.4th 1324, 1331-1332.)

relevant, defendant argued the evidence regarding Jason and Michael should be excluded as unduly prejudicial under section 352.[9]

The trial court (Hon. James S. Hawkins) ruled the evidence was admissible "under the code sections that we talked about," noting that "everything lines up" and the evidence was not prejudicial because "they're all the same act, virtually."

The trial court (Hon. Harold W. Hopp) revisited the issue after severing defendant's and Hann's cases. After hearing further argument, the court found the evidence relevant and admissible under section 1101(b) "because it does tend to show whether [defendant] had knowledge of what was going on with her children and whether they were being hurt by her partner." Regarding the section 352 balancing, the trial court found that because "the most severe injuries were suffered by Montana, . . . evidence of the injuries or death of the other children is less likely to be unduly prejudicial." Because the court found the evidence admissible under section 1101(b), the court found it unnecessary to determine whether it was also admissible under section 1109.

B. *Relevant Legal Principles*

Under section 1101, subdivision (a), " '[c]haracter evidence, sometimes described as evidence of propensity or disposition to engage in a specific conduct, is generally inadmissible to prove a person's conduct on a specified occasion.' " (*Leon, supra*, 61 Cal.4th at p. 597; see *Lindberg, supra*, 45 Cal.4th at p. 22.) Under section 1101(b),

---

[9] "Evidence may be excluded under . . . section 352 if its probative value is 'substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' " (*People v. Lindberg* (2008) 45 Cal.4th 1, 22-23 (*Lindberg*).)

15

" '[e]vidence that a person committed a crime, civil wrong, or other act may be admitted, however, not to prove a person's predisposition to commit such an act, but rather to prove some other material fact,' " such as motive, intent, knowledge, identity, or the existence of a common design or plan. (*Leon*, at p. 598; see *Lindberg*, at p. 22; *People v. Ghebretensae* (2013) 222 Cal.App.4th 741, 753 (*Ghebretensae*) ["Such evidence may be admitted to prove the person's knowledge of relevant facts . . . ."].)

"Cases sometimes describe . . . section 1101(b) evidence as 'prior offenses' or 'prior bad acts.' Both shorthand formulations are imprecise . . . . [¶] . . . [S]ection 1101(b) authorizes the admission of 'a crime, civil wrong, *or other act*' to prove something other than the defendant's character. (Italics added.) The conduct admitted under . . . section 1101(b) need not have been prosecuted as a crime, nor is a conviction required. [Citations.] The conduct may also have occurred after the charged events, so long as the other requirements for admissibility are met." (*Leon, supra*, 61 Cal.4th at p. 597; see *People v. Balcom* (1994) 7 Cal.4th 414, 425.)

"To be admissible, the evidence must be relevant to some material fact which is in issue, must have a tendency to prove that fact, and must not contravene other policies limiting admission, such as . . . section 352." (*Ghebretensae, supra*, 222 Cal.App.4th at pp. 753-754; accord *Lindberg, supra*, 45 Cal.4th at p. 22.)

"The relevance depends, in part, on whether the act is sufficiently similar to the current charges to support a rational inference of intent, common design, identity, or other material fact." (*Leon, supra*, 61 Cal.4th at p. 598.) The required similarity between the uncharged and charged acts varies with the purpose for which the uncharged acts are

16

offered:  proving the identity of a perpetrator requires the greatest degree of similarity, proving a common plan or scheme requires less, and the "least degree of similarity . . . is required in order to prove intent."  (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402-403 (*Ewoldt*); *Lindberg*, at p. 23.)  To prove intent, the uncharged offense need only "be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance."  [Citations.]' "  (*Ewoldt*, at p. 402.)

"We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under . . . sections 1101 and 352."  (*People v. Cole* (2004) 33 Cal.4th 1158, 1195.)

### C.  *Analysis*

The trial court did not abuse its discretion by admitting evidence of Jason's death and Michael's injuries because the evidence satisfies the criteria for admission.  (See *Ghebretensae, supra*, 222 Cal.App.4th at pp. 753-754; *Lindberg, supra*, 45 Cal.4th at p. 22.)

First, the evidence is relevant.  "[A] parent has a duty to protect his or her young child and may be criminally culpable on an aider and abettor theory for an assault causing death and on an implied malice theory for murder where the parent fails to take reasonably necessary steps for the child's protection, so long as the parent, with ability to do so, fails to take those steps with the intent of facilitating the perpetrator's assaultive offense."  (*People v. Rolon, supra*, 160 Cal.App.4th at p. 1209.)  Underlying the People's implied malice and aiding and abetting theories is the predicate, *disputed* fact that defendant knew Hann was abusing Montana.  Establishing that defendant knew Jason had

17

died and Michael had been severely injured under nonaccidental circumstances similar to those in which Montana died tended to establish defendant knew Hann was abusing Montana. (See, e.g., *People v. Goodall* (1982) 131 Cal.App.3d 129, 142 [defendant's prior drug-related incidents were properly admitted to rebut her claimed lack of involvement and unfamiliarity with PCP]; *Ghebretensae, supra*, 222 Cal.App.4th at p. 754 ["Prior incidents of possession of an illegal drug are relevant to prove the knowledge element" of possession of a controlled substance for sale.].)

Second, the evidence "ha[d] a tendency to prove" the fact at issue: defendant's guilty knowledge and intent regarding Montana. (*Ghebretensae, supra*, 222 Cal.App.4th at pp. 753.) The similarities between the uncharged and charged conduct here are striking. Jason died of "homicide by undetermined means" when he was six weeks old; Montana died of "homicidal violence by undetermined means" when she was 10 weeks old. Jason's broken rib was consistent with having been shaken or picked up and thrown against something; Montana's skull fractures were consistent with having been struck in the head or having her head repeatedly swung against a hard surface. The following evidence supports a strong inference that defendant was aware Jason was murdered: (1) defendant never informed authorities of his death; (2) she contradicted her specious spider-bite theory by confirming Hann's statement to the Steeveses that Jason died of "crib death"; (3) she concealed Jason's remains in a plastic container in her car as they traveled the country; and (4) she further concealed Jason's remains by leaving them in a

18

trailer she abandoned at a storage facility in Arizona.[10]  Likewise, defendant (1) never informed authorities of Montana's death; (2) concealed her remains in a plastic container in her trailer as they traveled the country; and (3) further concealed Montana's remains by leaving them in a trailer she abandoned in a storage facility in Arkansas.  The decomposition of Jason's remains prevented a comprehensive autopsy; so, too, with Montana.

Michael also suffered from extensive injuries indicating he had been violently shaken on at least two occasions during his first four weeks of life.  Although defendant asserts she should not be charged with knowledge of Michael's injuries because he "had no external signs of trauma," the symptoms of his abuse were apparent enough to alert his foster mother—based on her lay observations—that he required immediate medical attention.  Likewise, Montana suffered an "obvious" tibia fracture and periosteal thickening near the ankle that could also have caused swelling and redness.

We find the similarity between the circumstances of Jason's death and Michael's injuries, on the one hand, and Montana's death, on the other, highly probative of defendant's knowledge that Montana was being abused before her death, which is relevant to a material issue in dispute.

---

10    On the latter points, the trial court instructed the jury with CALCRIM No. 371 that defendant's concealment of evidence "may show that she was aware of her guilt."  (See CALCRIM No. 371; *People v. Jackson* (1996) 13 Cal.4th 1164, 1225 [approving predecessor to CALCRIM No. 371 (CALJIC No. 2.06)]; § 413 ["In determining what inferences to draw from the evidence or facts in the case against a party, the trier of fact may consider, among other things, the party's . . . willful suppression of evidence . . . ."].)

The third admissibility factor—that admission "must not contravene other policies limiting admission, such as . . . section 352" (*Ghebretensae, supra*, 222 Cal.App.4th at pp. 753-754)—is also satisfied. As noted, the challenged evidence is highly probative. Although it is "prejudicial" in the sense that it is extremely unpleasant, it is not *unduly* prejudicial within the meaning of section 352: " 'The "prejudice" referred to in . . . section 352 applies to evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Bolin* (1998) 18 Cal.4th 297, 320, citation omitted.) Here, the evidence was not intended to evoke an emotional bias, but rather, bore directly on a disputed material fact—whether defendant knew Hann was abusing Montana. Moreover, in expressly balancing the section 352 factors, the trial court found that because "the most severe injuries were suffered by Montana, . . . evidence of the injuries or death of the other children is less likely to be unduly prejudicial." We find no error in this conclusion.

In addition, the trial court attempted to minimize any prejudicial impact of the challenged evidence by instructing the jury that it could consider the evidence only "for the limited purpose of deciding whether" defendant possessed the requisite intent and knowledge. The instruction continued: "Do not consider this evidence for any other purpose." We presume the jurors followed these instructions (see *People v. Smith* (2007) 40 Cal.4th 483, 517), which minimized the risk the jury would consider the evidence for any improper purpose (see *People v. Barnett* (1998) 17 Cal.4th 1044, 1119).

20

Because the trial court properly admitted evidence of Jason's death and Michael's injuries under section 1101(b), we need not address whether the evidence was also admissible under section 1109.

## II. *Jury Instruction Regarding Standard of Proof of Other Acts*

Defendant contends the trial court erred by instructing the jury that the prior acts involving Jason and Michael could be established under the preponderance of evidence standard of proof rather than the reasonable doubt standard applicable to other circumstantial evidence. She argues this effectively lowered the People's burden of proof. The People contend defendant invited this error. Alternatively, they argue the trial court properly instructed the jury. We conclude defendant preserved the issue for appeal, but find no error in the trial court's instruction regarding the standard of proof.

### A. *Background*

After the trial court deemed the evidence regarding Jason and Michael admissible under section 1101(b), defendant and the People requested competing jury instructions to address the jury's consideration of that evidence. The People requested CALCRIM No. 852, which addresses other acts of domestic violence. Defendant requested CALCRIM No. 375, which addresses evidence of other acts more generally.

The trial court instructed the jury with CALCRIM No. 375 as follows:

> "The People presented evidence that the defendant committed other offenses that were not charged in this case.
>
> "You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the offenses. Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is

21

proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden, you must disregard this evidence entirely.

"If you decide that the defendant committed the uncharged offenses, you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not:

"Intent
"The defendant acted with an intentional omission or intentional failure to act in those situations where a person is under a legal duty to act

"Knowledge
"The defendant knew the unlawful purpose of the perpetrator, specifically, to commit felony child abuse or kill, when she acted or failed to act in a situation where a person has a legal duty to act.

"In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offenses and the charged offense.

"Do not consider this evidence for any other purpose.

"If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of Murder or Involuntary Manslaughter. The People must still prove the charge beyond a reasonable doubt."

The trial court also instructed the jury, more generally, regarding circumstantial evidence with CALCRIM No. 224 as follows:

"Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.

"Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the

22

defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

## B. *Invited Error*

The People assert that because defendant requested CALCRIM No. 375, she cannot challenge it on appeal. "The doctrine of invited error bars a defendant from challenging an instruction given by the trial court when the defendant has made a 'conscious and deliberate tactical choice' to 'request' the instruction." (*People v. Lucero* (2000) 23 Cal.4th 692, 723.) However, the doctrine does not apply when the appellant offered instructions on an issue only after unsuccessfully attempting to remove the issue from the case. (See *Horsemen's Benevolent & Protective Assn. v. Valley Racing Assn.* (1992) 4 Cal.App.4th 1538, 1555; *Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 212-213.) Defendant offered CALCRIM No. 375 as a limiting instruction only after the trial court ruled—over defendant's objection—that evidence regarding Jason's death and Michael's injuries was admissible. Defendant's request for this instruction was also defensive because the prosecutor requested CALCRIM No. 852, which addresses other instances of domestic violence, which defendant argued was confusing in light of the People's theory at trial. Under these circumstances, we decline to find that defendant invited any error regarding CALCRIM No. 375.

23

## C. *Analysis Regarding Standard of Proof*

Defendant correctly acknowledges the California Supreme Court has repeatedly upheld the applicability of the preponderance standard to the determination of other acts. (See *People v. Medina* (1995) 11 Cal.4th 694, 763 (*Medina*); *People v. Virgil* (2011) 51 Cal.4th 1210, 1259 (*Virgil*).) In *Medina*, the court observed it has "long held that 'during the guilt trial evidence of other crimes may be proved by a preponderance of the evidence . . . .' " (*Medina*, at p. 763.) The court explained that "facts tending to prove the defendant's other crimes for purposes of establishing his criminal knowledge or intent are deemed mere 'evidentiary facts' that need not be proved beyond a reasonable doubt as long as the jury is convinced, beyond such doubt, of the truth of the 'ultimate fact' of the defendant's knowledge or intent." (*Ibid.*, citation omitted.) The court concluded, "the cases have developed special rules for the consideration of other crimes evidence. We see no compelling reason to reconsider those decisions here." (*Id.* at p. 764.)

In *Virgil*, the appellant "urge[d] [the court] to reconsider the standard of proof" applicable to other acts evidence. (*Virgil, supra*, 51 Cal.4th at p. 1259.) The *Virgil* court reaffirmed the *Medina* approach, elaborating on the relationship between the two standards of proof: "The jury cannot consider [other acts] at all unless they find them proven by a preponderance of the evidence. 'If the jury finds by a preponderance of the evidence that defendant committed the other crimes, the evidence is clearly relevant and may therefore be considered. [Citations.]' If the jury finds the facts sufficiently proven for consideration, it must still decide whether the facts are sufficient, taken with all the

24

other evidence, to prove the defendant's guilt beyond a reasonable doubt." (*Virgil*, at pp. 1259-1260.)

Defendant recognizes these authorities, but argues they do "not resolve the appropriateness of the preponderance standard where, as here, evidence of *another* perpetrator's past and subsequent misconduct is admitted to establish that this defendant has aided and abetted that perpetrator's current crime with the requisite knowledge and intent." She argues it would be inappropriate to apply the preponderance standard where the "other misconduct of the perpetrator is attributed to a defendant based on an *assumption* that the defendant was aware of those crimes . . . ." We are not persuaded.

The jury here was not asked to *assume* that defendant knew Hann abused their children. Rather, the jury was asked to make a reasonable inference based on concrete evidence—evidence we characterized above as highly probative. We see no reason why the higher reasonable doubt standard should apply simply because the *defendant's* knowledge of another person's acts is at issue. As the *Medina* court noted, "the cases have developed special rules for the consideration of other crimes evidence. We see no compelling reason to reconsider those decisions here." (*Medina, supra*, 11 Cal.4th at p. 764.)

Defendant next argues that even if the trial court properly instructed the jury with CALCRIM No. 375, "it is not reasonable to presume" that, once the jury determined by a preponderance of evidence that defendant was aware of Hann's acts regarding Jason and Michael, the jury would consider that evidence under the reasonable doubt standard in connection with Montana as instructed in CALCRIM No. 224. We disagree. Aside from

25

CALCRIM No. 224's reasonable doubt instruction, CALCRIM No. 375 also instructed the jury that if it "conclude[d] that the defendant committed the uncharged offenses, . . . . *[t]he People must still prove the charge and allegations beyond a reasonable doubt*." (Italics added.) The jury was also instructed via CALCRIM No. 220 that defendant is presumed innocent unless proven guilty beyond a reasonable doubt, and via CALCRIM No. 642 that the jurors can return a guilty verdict only if all jurors "agree that the People have proved beyond a reasonable doubt that the defendant is guilty . . . ." Considering the jury instructions as a whole—as we must (see *Estelle v. McGuire* (1991) 502 U.S. 62, 72; *People v. Reliford* (2003) 29 Cal.4th 1007, 1013) and as the jury was instructed (see CALCRIM No. 200)—we conclude the jury was properly instructed regarding the standard of proof. We "presume . . . that jurors can grasp their duty—as stated in the instructions—to apply the preponderance-of-the-evidence standard to the preliminary fact identified in the instruction and to apply the reasonable-doubt standard for all other determinations." (*People v. Reliford, supra*, 29 Cal.4th at p. 1016.)

### III. *Prosecutorial Misconduct*

Defendant contends the prosecutor engaged in misconduct during her rebuttal closing argument by misstating the law regarding aider and abettor liability. (See *People v. Boyette* (2002) 29 Cal.4th 381, 435 ["it is misconduct for the prosecutor to misstate the applicable law"].)

"We review claims of prosecutorial misconduct pursuant to a settled standard. 'Under California law, a prosecutor commits reversible misconduct if he or she makes use of "deceptive or reprehensible methods" when attempting to persuade either the trial

26

court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted.  [Citation.]  Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights—such as a comment upon the defendant's invocation of the right to remain silent—but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " '  [Citations.]"  (*People v. Dykes* (2009) 46 Cal.4th 731, 760.)  "A defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety."  (*People v. Thornton* (2007) 41 Cal.4th 391, 454.)  Applying this standard, we conclude the prosecutor did not engage in misconduct.

The trial court indicated it would instruct the jury regarding aider and abettor liability with a modified version of CALCRIM No. 401, a portion of which provides:

"To prove that the defendant is guilty of murder based on aiding and abetting that crime, the People must prove that:

"1.  The perpetrator committed the crime;

"2.  The defendant knew that the perpetrator intended to commit the crime;

"3.  Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime, *by failing to act in a situation where a person has a legal duty to act*;

AND

27

"4.  The defendant's words or conduct, or *by failure to act in a situation where a person has a legal duty to act*, did in fact aid and abet the perpetrator's commission of the crime."  (Italics added.)

Defendant argues the prosecutor misstated this law during her rebuttal closing argument by telling jurors they could convict defendant based on her mere failure to act, without regard for whether she had the requisite knowledge and intent.  Defendant cites the following passage in which the prosecutor, while reading an instruction regarding natural and probable consequences, refers back to the portions of CALCRIM No. 401 italicized above regarding aiding and abetting:

> " 'A co-participant in the crime [of felony child abuse] is the perpetrator or anyone who aided and abetted the perpetrator.'  [¶ ] And then when we go back to aiding and abetting, we see that aiding and abetting includes— [¶ ]  'Someone aids and abets'— [¶ ]  There is the rest of the language—da, da, da.  '[O]r fails to act in a situation where a person has a legal duty to act.'  [¶ ]  So you can aid and abet in this type of child abuse by failing to act."

Defense counsel objected that this misstated the law.  The trial court responded, "I'm going to read that instruction to the jury.  So I don't see how that instruction misstates the law.  [¶ ]  Overruled."  Defendant contends this ruling was in error.  We disagree.

Defendant's claim fails because she does not consider the challenged statement in the context of the prosecutor's entire closing argument, as she must.  (See *People v. Dennis* (1998) 17 Cal.4th 468, 522 ["Although defendant singles out words and phrases, or at most a few sentences, to demonstrate misconduct, we must view the statements in the context of the argument as a whole."].)  Viewed through the proper lens, the

prosecutor's closing argument accurately stated the law regarding aider and abettor liability.

In her initial closing argument, the prosecutor read the entire passage from CALCRIM No. 401 quoted above, which addresses the knowledge and intent requirements. The prosecutor argued repeatedly that defendant was aware Hann had abused their children. In her rebuttal argument, the prosecutor re-read the elements of aiding and abetting from the modified CALCRIM No. 401, including the knowledge and intent requirements. She again argued defendant knew Hann had abused their children. Considered as a whole, the prosecutor's argument cannot reasonably be construed as telling jurors they could find defendant guilty as an aider and abettor based on mere inaction without regard to her knowledge or intent.

## DISPOSITION

The judgment is affirmed. The trial court is directed to (1) amend the abstract of judgment to reflect in paragraph 6.1 that defendant's sentence relates to count 2, not count 1, and (2) forward the amended abstract of judgment to the Department of Corrections and Rehabilitation.

HALLER, J.

WE CONCUR:


HUFFMAN, Acting P. J.


O'ROURKE, J.

29