Filed 5/5/16  P. v. Guevara CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>JULIO CESAR GUEVARA,<br><br>        Defendant and Appellant. | B264141<br><br>(Los Angeles County<br>Super. Ct. No. KA 106687) |

APPEAL from a judgment of the Superior Court for the County of Los Angeles. Salvatore T. Sirna, Judge.  Affirmed.

Michelle T. Livecchi-Raufi, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Timothy M. Weiner and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## SUMMARY

A jury convicted defendant Julio Cesar Guevara of possession for sale of a controlled substance and transportation of a controlled substance for sale (both felonies), and of resisting a peace officer (a misdemeanor). Defendant waived his right to a jury trial on his prior convictions, and admitted a prior strike conviction for robbery in 2003. He was sentenced to six years in state prison.

On appeal, defendant raises four issues. He contends his conviction for resisting arrest should be reversed because the trial court failed to instruct, sua sponte, on excessive force. He contends the trial court erred when it instructed with CALCRIM No. 361 (a defendant's failure to explain or deny adverse testimony). He contends his admission of his prior conviction was not knowing and voluntary because, although the trial court advised him of his right to a jury trial, the court did not advise him of his confrontation right and of his privilege against compulsory self-incrimination. And he contends the court abused its discretion in the admission of certain evidence.

We find no reversible error and affirm the judgment.

## FACTS

On July 18, 2014, police officers Michael Lee and Mark Medellin observed defendant, driving alone in a white Ford Explorer, make a U-turn over a double yellow line and park at a red curb in front of a fire hydrant. The officers were in an unmarked car, and both wore a "class C" uniform consisting of a black polo shirt with a cloth badge, side patches and the word "police" written across the back, with a belt including a radio holder, holster, extra ammunition, handcuffs and a taser.

Officer Lee made a U-turn to effect a traffic stop, and parked behind the white Explorer. As he did so, he observed defendant throw an object out of the passenger window. His partner, Officer Medellin, saw "a baggie flying out from the passenger side window, and it looked like some kind of contents in the baggie." Officer Medellin also saw defendant toss something else, "[o]ne right after the next." (This turned out to be a needle and syringe that "appeared to be used, but there was nothing inside of it.") Officer Medellin got out of the car and approached the driver (defendant), and saw him

2

rummaging through the center console of the Explorer. Officer Medellin said, "Police," and told defendant to stop, but defendant ignored him and "continued to do what he was doing." Officer Medellin grabbed defendant's left arm with both his hands and started pulling "because I was afraid that he may pull out a weapon or something like that." Defendant "was just tensing up and pulling away" from Officer Medellin, and they "were in a struggle like a tug of war."

Then defendant started shouting. Officer Medellin "couldn't really understand what he was shouting other than I heard him say something like throwing, throwing, he threw something." Defendant also yelled "police" more than once. "What I thought he was trying to say was that he threw something and the police are contacting him. And it sounded like he was saying it -- [¶] . . . [¶] . . . -- to someone."

Officer Medellin leaned further into defendant's car. Defendant "had the leverage because he was sitting down," so Officer Medellin "grabbed around [defendant's] neck and started pulling him toward me," in a "head and arm" hold in which "[y]ou grab around his head and try to pinch his arm down, also." Officer Medellin was "trying to gain control" and had defendant "in sort of like that neck hold."

Officer Lee had followed Officer Medellin to the driver's side of the Explorer. He saw Officer Medellin trying to get defendant's hands under control, and noticed the car was still in "drive" gear, but not in motion because defendant had his foot on the brake. Officer Lee "was able to reach in and at least turn the vehicle off to prevent the vehicle from moving any further."

After he took the keys out of the Explorer, Officer Lee ran around to the passenger side, and climbed into the car. Officer Medellin "let go" of defendant (see *post*), and Officer Lee tried to get defendant's hands under control and place him in handcuffs. Defendant kept pulling away from the officers, and "started screaming the word 'police' over and over again . . . ." Defendant "was yelling it loud enough that from the street people inside the apartment complex heard him and came out." (The defendant's car was parked in front of an apartment complex in "a fairly high crime area," and Officer Lee had been involved in numerous investigations involving narcotics at that location.)

3

Officer Lee was not able to get a solid grip on defendant's arm because of the angle, and "[e]very time I grabbed his hand he pulled it away from me." Officer Lee tried to get a grip on defendant's hands "[a]t least four or five" times, and told defendant several times to "stop moving, stop resisting, give me your hands, things of that nature." Ultimately, defendant complied and Officer Lee and another officer took defendant into custody.

Meanwhile, Officer Medellin saw a woman looking down "toward where I saw the baggie that had the contents in it." The woman looked at Officer Medellin and "darted for the baggie." So Officer Medellin, who had been trying to gain control with the neck hold, "let go and . . . ran around toward the baggie as well," and was able to retrieve it before the woman got to it. (Officer Lee said that, "because of the crowd that was coming from the apartments [Officer Medellin] went around and he had to recover the evidence that was thrown out of the vehicle and keep the crowd away from [Officer Lee] while I [(Officer Lee)] continued attempting to detain the [defendant] inside the vehicle.")

After Officer Medellin grabbed the baggie and the needle and syringe defendant had tossed from the car, the woman kept coming towards him, and a crowd of "at least 15 to 20 other people" was forming behind her. He "could see people in the background shouting at us, and then off to my right-hand side I could see my partner struggling with [defendant] to try to take him into custody . . . ." Officer Medellin heard "derogatory statements towards the police, and my state of mind was that this group was coming out to assist [defendant], possibly try to lynch him away from us. And then there was a separate standoff between me and the female who wasn't backing away, so she came to me closer so I finally grabbed her by the arm and put her on the ground." There was also "a second individual that [Officer Medellin] had to forcefully take to the ground."

Several other officers (at least eight) arrived and, according to Officer Medellin, "I would say it took a good two minutes or three minutes before we could actually get everybody under control."

Officer Lee later searched defendant's car and found a cell phone, a black digital scale in a black tool bag, and $131 (six $20's, a $10, and a $1 bill) "that was crumpled up

4

and placed inside a red and black craftsman tool bag." Both bags were in the rear seat on the passenger side of defendant's car.

Defendant was charged by information with felony violations of Health and Safety Code sections 11378 (possession for sale of methamphetamine) and 11379, subdivision (a) (transportation of methamphetamine for sale), and with a misdemeanor violation of Penal Code section 148, subdivision (a)(1) (resisting a peace officer). The information also alleged defendant had one prior serious or violent felony conviction within the meaning of the "Three Strikes" law (Pen. Code, § 667, subds. (b)-(j), § 1170.12), and alleged defendant had served two prior prison terms within the meaning of Penal Code section 667.5, subdivision (b).

The court granted defendant's motion to bifurcate the issue of his prior convictions and, before the jury was selected, defendant waived his right to a jury trial on his prior convictions.

At trial, a criminalist testified that the substance recovered by the police was methamphetamine, weighing 6.1747 grams, and that is "a fair amount. Most of the cases that are submitted to me for analysis with respect to methamphetamine are well under a gram."

Officer Lee opined, based on his background, training and experience, that defendant possessed the 6.1747 grams for sale. He testified the quantity found "isn't typical with users," and that the average user typically buys one-quarter gram bags that cost about $20. A seller could break down the 6 grams into 24 one-quarter gram bags that could be sold for "roughly $500." The scale also suggested this was a sales case. In addition, dealers "will crumple up the money and place it somewhere near them as quickly as they can," in order to allow for rapid transactions. The $20 denominations of the crumpled bills police found were consistent with someone that is selling methamphetamine.

Defendant testified in his own defense, maintaining that he used but had never sold methamphetamine, and had no prior convictions for sales. He testified that on the day of the incident, he cashed his paycheck at a bank, "grab[bed] something to eat

5

and . . . was on [his] way home." He stopped at a friend's house to pick up the methamphetamine the police found. His paycheck was "about $500." He was using methamphetamine, "like a gram a day," and he was purchasing once a week. This was because "it was too much for me to go back and forth every day, couple of times a day," and he "[didn't] have time for all of that." Defendant normally purchased 6.5 grams of methamphetamine, and had been buying that amount from the same dealer, his "regular" seller, for approximately five months. He paid $250 for the 6.5 grams, and "I've always paid that."

Defendant said he has used methamphetamine off and on since he was 15 years old. The scale found in his work bag belonged to him. He used the scale to weigh his purchases. He explained: "Since I buy a large amount, which is six grams, it was like 6.5, I used some before I left. Before I drive off with the material, with the substance, I weigh it out to make sure I don't drive off and they gipped me for my money. So I weigh it out, make sure it's correct, what I'm purchasing, and I drove off. I seen what it was, I put the scale back in the bag, and I drove off."

Defendant testified that the $131 was his, and the amount was "what was left after I did my spending."

Defendant said that when he made the U-turn, he was stopping outside his apartment to pick up his wife to take her to a McDonald's. He noticed the police "when I had stopped in front of the apartments. . . . I didn't put the brake on because I asked somebody to call . . . my wife, and so I didn't put it on park. And so I had my foot on the brake and I noticed that the officers were passing by next to me like this. At that moment I seen them and . . . I grabbed the substance and I reached over and I threw it out the window."

Defendant did not hear the officers say anything to him before an officer grabbed him. "I had my hands like this on the steering and I just felt getting yanked like this. And the car started rolling forward, he had me like this, on my tippy toes, I pushed the brake real quick, it was a quick movement. I didn't want to take it off because it was gonna hit the car in front." Defendant said he was trying to put the car in park when the

6

police grabbed his arms, but he could not. "[T]hey were trying to get me out." Defendant's window "was almost all the way down, so [the officer] had enough to grab me and pull me to the back to the side of the car like this. He had me pinned against my door and at the same time I was leaning back and my tippy toe I was barely holding onto the brake."

Defendant said his seat belt was on at the time. "That's why they couldn't maneuver me like they wanted to, or else they would have got me right out. I told them the seatbelt was on so they got -- they booked me out [*sic*] and I complied. That's when I complied, and that's how I slid out the passenger door. I went out voluntarily with myself, too." (Officer Lee was asked whether he recalled "if the driver ever removed his seat belt," and he responded, "I don't remember it being on.")

Defendant did not try to strike any officer, or to spit on any officers, or to run, or to drive away. Defendant testified: "When they came up, they didn't say 'police,' nothing. I just got yanked, boom. They obviously saw me throw something." He said that he "yelled 'police' " during the yanking, and that he did so "more than just a few times . . . ." Defendant denied that he was yelling for his girlfriend to come and pick up the drugs. He testified that he said, "call Lisa, tell her the police got me."

The jury convicted defendant on all three counts.

At a hearing three weeks later, defendant admitted that he suffered a prior conviction for robbery, and counsel joined in the admission. The court accepted defendant's admission of the strike prior. The court considered and denied defendant's *Romero* motion to dismiss the strike in the interest of justice (*People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*)), observing that the case was "within the spirit of the three strikes sentencing scheme, especially given defendant's prior criminal history."

The court sentenced defendant to six years in state prison, and made other orders not at issue in this appeal.

## DISCUSSION

Defendant raises several claims of error. None of them has merit.

7

## 1.      The Lack of Instruction on Excessive Force

The trial court instructed the jury with CALCRIM No. 2656, telling the jury that to prove defendant was guilty of resisting, obstructing, or delaying a peace officer, the prosecution had to prove that the officers "were peace officers lawfully performing or attempting to perform their duties"; that defendant "willfully resisted, obstructed, or delayed" either officer in the performance or attempted performance of those duties; and that defendant knew or reasonably should have known they were peace officers.  As *People v. Ghebretensae* (2013) 222 Cal.App.4th 741, 759 (*Ghebretensae*) confirms, this is a proper instruction on the legal elements of resisting arrest (Pen. Code, § 148, subd. (a)).

Defendant requested no further instructions at trial, but on appeal he contends there was evidence the officers used excessive force in arresting him, making his arrest unlawful, and so the court had a sua sponte duty to instruct the jury on excessive force. (See *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1217 [a defendant cannot be convicted of an offense against a peace officer in the performance of his duties "unless the officer was acting lawfully at the time," italics omitted]; *People v. Castain* (1981) 122 Cal.App.3d 138, 145 [jury considering resisting arrest charge "must acquit if it finds the officer used excessive force"].)  Defendant's claim fails in its premise, as the evidence did not support an instruction on excessive force.

The applicable rule is this.  " 'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence.  [Citations.]  The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.'  [Citations.]  Included within this duty is the '. . . obligation to instruct on defenses, . . . and on the relationship of these defenses to the elements of the charged offense . . . ' where ' . . . it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense . . . .'  [Citation.]" (*People v. Stewart* (1976) 16 Cal.3d 133, 140 (*Stewart*); see *Ghebretensae, supra*, 222 Cal.App.4th at p. 760 [discussing CALCRIM

8

No. 2656 and bench notes indicating further instructions to be given " '[w]hen lawful performance is an issue' "].)

Here, neither condition specified in *Stewart* applied. Defendant presented no claim or argument that the officers used excessive force or otherwise acted unlawfully in effecting his arrest; his theory of the case was simply that he did not resist their efforts to arrest him. And as described above, there was no "substantial evidence supportive of" an excessive force claim. (*Stewart, supra*, 16 Cal.3d at p. 140.)

Defendant insists on appeal the evidence shows he was "trying to defend himself from the physical force being placed on him"; was "pulling back from the police" because "his foot was on the brake and he did not want the car to roll"; and he did not hear either officer yell "police." But the question is whether the evidence showed excessive force, not what defendant was thinking at the time – and defendant himself testified that he "yelled 'police' " during the "yanking," and that he did so "more than just a few times."

The cases defendant cites – in both of which the theory of defense at trial involved excessive force – do not support a different conclusion. (See *People v. White* (1980) 101 Cal.App.3d 161, 169, 167-168 [the defendant proffered a combined defense of excessive force and self-defense; testimony from the defendant, corroborated by another witness, showed the police officer started choking and beating the defendant; instructions were incomplete in failing to tell the jury that if they found the arrest was made with excessive force, it was unlawful and they should find the defendant not guilty of resisting arrest]; *People v. Castain, supra*, 122 Cal.App.3d at pp. 141, 142-144 [defendant and a companion testified that arresting officer choked defendant, threw him against the side of the car, dragged him backwards into the street, and after their struggle ended twice threatened defendant, saying he was " 'going to be dead by morning' "; trial court abused its discretion in excluding evidence the officer used excessive force on another occasion].)

In sum, because there was no substantial evidence of excessive force, the trial court had no duty to give an instruction the defendant did not request. (See

9

*Ghebretensae, supra*, 222 Cal.App.4th at pp. 760-761 [affirming trial court's refusal to instruct with CALCRIM No. 2670 (which explains that a peace officer is not lawfully performing his duties if he is using excessive force) in connection with charge of resisting arrest; the trial court "correctly determined that the evidence did not support the instruction requested by the defense and therefore should not be given"].)

## 2. CALCRIM No. 361

The trial court instructed the jury with CALCRIM No. 361 (failure to explain or deny adverse testimony) as follows:

> "If the defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt. If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

Defense counsel did not object when the trial court identified the instruction as among those to be given.

On appeal, defendant argues the trial court erred in giving the instruction, because defendant did not fail to explain or deny any fact or evidence within his personal knowledge. The error, he contends, was prejudicial. We disagree.

"Even without an objection, a defendant may challenge on appeal an instruction that affects 'the substantial rights of the defendant . . . .' " (*People v. Hillhouse* (2002) 27 Cal.4th 469, 505-506, quoting Pen. Code, § 1259; see *People v. Haynes* (1983) 148 Cal.App.3d 1117, 1120, 1122 [instruction on failure to explain or deny adverse testimony "now challenged for the first time was not even discussed below nor was its subject matter mentioned by either counsel during his argument to the jury"; circumstances showed that "any theoretical error occasioned by [the instruction] was harmless"]; *People v. Arredondo* (1975) 52 Cal.App.3d 973, 978 [citing Pen. Code, § 1259 and observing that "[t]he cases equate 'substantial rights' with reversible error, i.e., did the error result

10

in a miscarriage of justice?"].)  Here, the instruction did not result in a miscarriage of justice.

The relevant principles are described in *People v. Saddler* (1979) 24 Cal.3d 671 (*Saddler*).  *Saddler* construed CALJIC No. 2.62, an instruction "similar in content" to CALCRIM No. 361.  (*People v. Rodriguez* (2009) 170 Cal.App.4th 1062, 1066.)  *Saddler* found CALJIC No. 2.62 "suffers no constitutional or other infirmity and may be given in an appropriate case," but found the instruction was improper in that case because there were "no facts or evidence in the prosecution's case within [the defendant's] knowledge which he did not explain or deny."  (*Saddler*, at pp. 681-682.)  The court pointed out that " 'It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference [citation].'  [Citation.]"  (*Id.* at p. 681.)  The error, however, was harmless, even though a previous trial in which the instruction had not been given resulted in a hung jury.  (*Id.* at p. 684 ["Nevertheless, the circumstances of the robbery, the strength of the identification testimony, and the fact that the jury reached its verdict after one and a half hours of deliberation, persuade us that the instructional error was harmless."].)

In this case, respondent asserts there was evidentiary support for the instruction. The prosecution presented evidence that defendant had $131 in his tool bag.  When defense counsel asked him to "account for why the amount," defendant testified, "[t]hat's what was left after I did my spending," and his spending was for "food and I bought my substance."  On cross-examination, defendant testified the check he cashed from his employer was for roughly $500; that after he cashed it he "got something to eat" and bought the methamphetamine for $250.  The prosecutor then asked, "[w]here is roughly the $120?  Because $250 plus the $131 found in your tool bag comes out to $381 . . . ." Defendant answered, "I don't know exactly how much it was"; that he was sure he was paid roughly $500 that day, but "I just don't know how much money was left.  I wasn't keeping count of how much I had left over, I just threw it all in the back."  Defendant testified that $100 is an important amount of money, "but at the moment . . . I was too

11

stuck into my use. So, I don't know, I wasn't focused on how much I have left, I just threw it in the bag and I'll count it later."

Regardless of whether this testimony provides adequate evidentiary support for the instruction, any error in giving CALCRIM No. 361 was harmless. (See *People v. Lamer* (2003) 110 Cal.App.4th 1463, 1471 (*Lamer*) ["we apply the harmless error standard adopted in *People v. Watson* (1956) 46 Cal.2d 818, 836" (*Watson*)].) *Lamer* is instructive.

In *Lamer*, the court said this: "Although . . . courts have frequently found giving CALJIC No. 2.62 to constitute error, we have not found a single case in which an appellate court found the error to be reversible under the *Watson* standard. On the contrary, courts have routinely found that the improper giving of CALJIC No. 2.62 constitutes harmless error." (*Lamer, supra*, 110 Cal.App.4th at p. 1472 [citing cases "all concluding that CALJIC No. 2.62 was improperly but harmlessly given"].)

The court in *People v. Vega* (2015) 236 Cal.App.4th 484 (*Vega*) made the same point about CALCRIM No. 361 in finding harmless error. "[W]e evaluate the impact of CALCRIM No. 361 in the context of the instructions as a whole, starting with the carefully constructed internal balance to No. 361 itself. CALCRIM No. 361 does not direct the jury to draw an adverse inference. It instructs the jury that failure to explain or deny *alone* is not a sufficient basis upon which to infer guilt, and it highlights the prosecution's burden to prove guilt beyond a reasonable doubt. [Citations.] Ultimately, the instruction leaves the 'meaning and importance' of the failure to explain or deny in the jurors' hands. (CALCRIM No. 361.)" (*Vega,* at pp. 502-503.)

On the record here, we see no probability that defendant would have obtained a more favorable result if CALCRIM No. 361 had not been given. The evidence we have described in our recitation of the facts – including the "large amount" of methamphetamine involved, the crumpled currency and digital scale in defendant's bags in the back seat of the car, and the expert opinion of Officer Lee – strongly supported possession of the methamphetamine for sale, and the evidence defendant resisted police efforts to detain him was equally strong. And, while the prosecutor's closing arguments

12

challenged defendant's credibility on a number of points, the prosecutor did not mention CALCRIM No. 361.

In sum, no prejudice appears, and the evaluation of CALCRIM No. 361 described in *Vega* is directly on point.  Further, as the court observed in *Vega*, "[i]t is also notable that the trial court told the jury here that not all the instructions were necessarily applicable (CALCRIM No. 200), and advised jurors to follow the instructions that applied to the facts determined by them, thereby 'mitigat[ing] any prejudicial effect' related to the giving of CALCRIM No. 361, if it were deemed to be improper."  (*Vega, supra,* 236 Cal.App.4th at p. 503.)  Again, the same is true in this case.

**3.**     **Failure to Advise on Waiver of Constitutional Rights**

Defendant contends his admission of his prior strike conviction was not voluntary and intelligent because, while he waived his right to a jury trial, he was not advised of his constitutional rights to confrontation and freedom from compulsory self-incrimination. We disagree with defendant's conclusion.

**a.**     **The legal background and applicable principles**

In *Boykin v. Alabama* (1969) 395 U.S. 238 (*Boykin*), the high court held it was error to accept a guilty plea "without an affirmative showing that it was intelligent and voluntary."  (*Id.* at p. 242.)  The court explained:  "Several federal constitutional rights are involved in a waiver that takes place when a plea of guilty is entered in a state criminal trial.  First, is the privilege against compulsory self-incrimination . . . . [Citation.]  Second, is the right to trial by jury.  [Citation.]  Third, is the right to confront one's accusers."  (*Id.* at p. 243.)  The court held that "[w]e cannot presume a waiver of these three important federal rights from a silent record."  (*Ibid.*)

In *In re Tahl* (1969) 1 Cal.3d 122 (*Tahl*), our own Supreme Court held that "each of the three rights mentioned – self-incrimination, confrontation, and jury trial – must be specifically and expressly enumerated for the benefit of and waived by the accused prior to acceptance of his guilty plea."  (*Id.* at p. 132.)

13

In *In re Yurko* (1974) 10 Cal.3d 857 (*Yurko*), the court held that the decisions in *Boykin* and *Tahl* applied to an accused's admission of prior felony convictions. (*Yurko,* at p. 863.)

In *People v. Howard* (1992) 1 Cal.4th 1132, the court recognized that, contrary to its holding in *Tahl,* "the high court has never read *Boykin* as requiring explicit admonitions on each of the three constitutional rights." (*Howard,* at p. 1177.) In *Howard*, the court "adopt[ed] the federal test in place of the rule that the absence of express admonitions and waivers requires reversal regardless of prejudice." (*Id.* at p. 1178.) Thus, "a plea is valid if the record affirmatively shows that it is voluntary and intelligent under the totality of the circumstances." (*Id.* at p. 1175.) Nonetheless, "explicit admonitions and waivers are still required in this state," because they are "the only realistic means of assuring that the judge leaves a record adequate for review." (*Id.* at pp. 1178-1179; see *id.* at p. 1180 ["[o]n this record, . . . defendant's admission of the prior conviction was voluntary and intelligent despite the absence of an explicit admonition on the privilege against self-incrimination"].)

Finally, in *People v. Mosby* (2004) 33 Cal.4th 353 (*Mosby*), the court addressed a circumstance similar to this case: "When, immediately after a jury verdict of guilty, a defendant admits a prior conviction after being advised of and waiving only the right to trial, can that admission be voluntary and intelligent even though the defendant was not told of, and thus did not expressly waive, the concomitant rights to remain silent and to confront adverse witnesses? The answer is 'yes,' if the totality of circumstances surrounding the admission supports such a conclusion." (*Id.* at p. 356.) *Mosby* tells us that "[n]ow, if the transcript does not reveal complete advisements and waivers, the reviewing court must examine the record of 'the entire proceeding' to assess whether the defendant's admission of the prior conviction was intelligent and voluntary in light of the totality of circumstances." (*Id.* at p. 361.)

**b.     The circumstances in this case**

Consonant with *Mosby*'s directive, we turn to our review of the record.

14

The information alleged three prior felony convictions for various purposes:  the robbery conviction in 2003, possession of a firearm by a convicted felon in 2005, and possession of a controlled substance in 2010.  The information alleged defendant served prison terms for two prior convictions, and did not remain free of custody during the five years after completion of those prison terms.  (Defendant's confidential probation report shows these convictions, as well as two sustained juvenile petitions in 2001 and 2002.)  The record does not show whether the prior convictions were by plea or after trial.

On the day before the jury was selected, the court granted defendant's motion to bifurcate the issue of defendant's prior convictions.  Defense counsel stated that "[i]t will be a court issue," and "[i]f the court says it's coming in, we'll probably just stipulate."  The prosecutor clarified:  "If your client is convicted he has a right to have a jury trial on the issue of his priors.  Your client can waive that right and have a court trial on the priors.  That's what the court wants to determine."  Defense counsel responded, "We want the court the handle everything, so court trial."

The following day, before jury selection, defendant waived his right to a jury trial on his prior convictions  in the following exchange:

"[THE COURT]:  Yesterday we talked about the issues of priors, and I know, [defense counsel], you indicated that defendant was going to waive his right to a jury trial in that regard and agree to have the prior -- the issue of the priors heard before the court only after the trial of the three charges.  [¶]  So Mr. Guevara, do you understand, sir, that you have a right to have the issue of your prior convictions tried before a jury?  'Yes?'

"THE DEFENDANT:  Yes.

"THE COURT:  Do you waive and give up that right and agree that the court may hear those issues of your priors after the trial on the three charges?

"THE DEFENDANT:  Yes.

"THE COURT:  You join, counsel?

"[DEFENSE COUNSEL]:  Yes."

15

On April 8, 2015, about three weeks after the ensuing trial and convictions, the court held a hearing to consider defendant's *Romero* motion, as well as "a trial on the priors, and . . . sentencing." When the court asked defense counsel whether there was anything not in the *Romero* motion that the court should consider, the prosecutor began this exchange:

"Actually, before we consider that, if I could take -- it is my understanding, Your Honor, that the defendant will admit the strike prior so that we can proceed with the *Romero* motion.

"THE COURT: Great. So I'll let [you do] that first . . . . Thank you.

"[THE PROSECUTOR]: Mr. Guevara, it is my understanding that you are going to admit to your strike prior; is that correct?

"THE DEFENDANT: Correct.

"[THE PROSECUTOR]: And, pursuant to Penal Code section 667, subsection (d), and Penal Code section 1170.12, subsection (b), do you admit that you suffered a prior conviction for robbery, which is Penal Code section 211 in case No. KA062221, on June 23rd, 2003, from the Los Angeles Superior Court? Do you admit to that?

"THE DEFENDANT: Yes.

"[THE PROSECUTOR]: Does counsel join in the admission?

"[DEFENSE COUNSEL]: Join. Yes.

"[THE PROSECUTOR]: People join. And --

"THE COURT: Okay. Thank you [prosecutor]. [¶] The court accepts defendant's admission of the strike prior, a violation of Penal Code section 211, Case KA062221, with conviction date of June 23, 2003."

We are thus presented with the same question presented in *Mosby*. While defendant plainly knew of his right to trial, he "was not told of, and thus did not expressly waive, the concomitant rights to remain silent and to confront adverse witnesses." (*Mosby, supra*, 33 Cal.4th at p. 356.) But, as in *Mosby*, we conclude on this record that

16

under the totality of the circumstances, defendant voluntarily and intelligently admitted his prior conviction.

In this case, before the jury trial on the substantive charges, defendant was told, and confirmed he understood, his right to trial on his prior convictions. On March 10, 2015, the prosecutor told him he had that right, and defendant confirmed his understanding the following day, March 11, when the court questioned him: "So Mr. Guevara, do you understand, sir, that you have a right to have the issue of your prior convictions tried before a jury? 'Yes?' " and defendant answered "Yes."

That same day, March 11, the jury was selected. Defendant was present. The court told the prospective jurors that defendant "has an absolute right not to testify. . . . The defendant . . . can simply sit here during the entire trial and not say a single word . . . ."

The following day (March 12), before testimony began, the court instructed the jury, telling them: "After the People present their evidence the defense may also present evidence, but is not required to do so. Because he is presumed innocent, the defendant does not have to prove he is not guilty." During the trial, the prosecution presented testimony from Officer Lee and Officer Medellin, and defendant's counsel cross-examined both of them. Then, three weeks after his March 16 conviction, defendant admitted his prior strike.

In short, defendant expressly waived a jury trial on his prior convictions, and immediately thereafter underwent a jury trial on his substantive offenses. While defendant testified at the trial, on this record we think it impossible that defendant remained unaware of his right not to do so. And, as in *Mosby*, "because he had, through counsel, confronted witnesses at that immediately concluded trial, he would have understood that at a trial he had the right of confrontation." (*Mosby, supra*, 33 Cal.4th at p. 364.) While we recognize that in *Mosby*, the defendant waived his right to trial on the priors immediately after (rather than as here, immediately before) the trial, we think the conclusion to be drawn – that defendant understood his rights at a trial to remain silent and confront witnesses – can be no different.

In addition, " 'a defendant's prior experience with the criminal justice system' is . . . 'relevant to the question [of] whether he knowingly waived constitutional rights.' " (*Mosby, supra*, 33 Cal.4th at p. 365, quoting *Parke v. Raley* (1992) 506 U.S. 20, 37.)  The record here does not show (as it did in *Mosby*) whether defendant's previous three convictions were based on guilty pleas ("at which he would have received *Boykin-Tahl* advisements").  (*Mosby,* at p. 365 [the defendant " 'had experience in pleading guilty in the past, namely, the very conviction that he was now admitting' "].)  But defendant's three convictions, in 2003, 2005, and 2010, necessarily involved either pleas or trials – and in either case it is hard to avoid the conclusion that, in the present case, defendant must have known that his trial rights included the right not to incriminate himself and the right to confront witnesses.

Defendant relies on *People v. Cross* (2015) 61 Cal.4th 164, but nothing in *Cross* in any way alters the principles we have described.  In *Cross*, a defendant charged with felony infliction of corporal injury stipulated at trial to a prior conviction under the same statute, "and the trial court accepted the stipulation without advising [defendant] of any trial rights or eliciting his waiver of those rights."  (*Id.* at p. 168.)  The court reiterated principles earlier expressed in *Howard* and *Mosby*, and concluded the record "contain[ed] no indication that [the defendant's] stipulation was knowing and voluntary, and the Attorney General does not contend otherwise."  (*Cross*, at pp. 179-180 [counsel read stipulation in open court during prosecutor's direct examination of the first witness in the trial; the trial court immediately accepted it and did not "in any way inform [defendant] of his right to a fair determination of the prior conviction allegation"].)  *Cross* is in no way comparable to this case.

We conclude, based on the totality of the circumstances, that defendant voluntarily and intelligently admitted his prior strike conviction.

4.     **Claims of Error in Admission of Evidence**

Defendant contends the trial court abused its discretion when it overruled his objections, on relevancy or speculation grounds, to several questions.  Defendant describes the challenged testimony as evidence defendant was "roiling up a crowd against

the police," and contends the testimony was irrelevant, speculative, and prejudicial. Defendant cites the following:

First, counsel objected as Officer Lee was answering the prosecutor's question about what Officer Lee did after he entered the passenger side of the car. Officer Lee answered that he was trying to get defendant's hands under control, and continued: "At that time [defendant] kept pulling away from us, he started screaming the word 'police' over and over again which -- [¶] . . . [¶] . . . which attracted -- several people came out of the apartment complex." Counsel objected on relevance and hearsay grounds, and the court overruled the objection on both grounds.

Second, Officer Medellin testified that 15 to 20 people were coming out of the apartment building, "because there was a big commotion at this point," and the prosecutor asked, "When you say commotion, commotion from what?" Officer Medellin answered, "From the shouting of police from [defendant], mainly. That was what brought -- all the shouting is what brought or gained everybody's attention and brought everybody out." Defense counsel objected, "Calls for speculation," and the court overruled the objection.

Third, after Officer Medellin testified he could see "people in the background shouting at us," the prosecutor asked, "When you say the crowd shouting at you, shouting what, if you can remember?" The court sustained defense counsel's objection on relevance grounds. Then the prosecutor asked: "So why don't you tell me your state of mind in terms of the crowd gathering and shouting at you?" The court overruled counsel's relevance objection, and Officer Medellin replied: "There was derogatory statements towards the police, and my state of mind was that this group was coming out to assist [defendant], possibly try to lynch him away from us. And then there was a separate standoff between me and the female who wasn't backing away, so she came to me closer so I finally grabbed her by the arm and put her on the ground."

Fourth, Officer Medellin testified: "At that point there was a male who came running at me. So I had the female on the ground and I was holding her down with my knees and a male came at me and I just grabbed him by his shirt, by the front of his shirt,

19

and pulled him down." Defense counsel objected on relevance grounds and asked for a sidebar, which was not reported. No ruling on the objection appears in the record. The prosecutor then asked whether the crowd was under control "[a]t this point"; the officer answered "No"; and the prosecutor asked, "What else happened?" Officer Medellin said there "was still this feeling they were closing in and there was a lot of derogatory statements toward the police." Defense counsel objected to the relevance of "this line of testimony," and the trial court sustained the objection. Thereafter, Officer Medellin testified, without objection, that several patrol officers arrived and "I would say it took a good two minutes or three minutes before we could actually get everybody under control."

Defendant contends the trial court abused its discretion when it admitted the portions of the testimony just described to which he objected. We see no error.

Testimony about defendant yelling "police" was plainly relevant to rebut defendant's assertion the officers did not identify themselves as police. The testimony that defendant's yelling attracted the crowd was not speculation; it was an entirely reasonable inference to draw. The evidence that the crowd was unruly and made derogatory remarks about the police (and Officer Medellin's testimony about what he thought was happening) was relevant to explain the officers' conduct in the course of effecting defendant's arrest.

In short, the testimony was relevant and it was not speculative. Nor was admission of the testimony prejudicial. Defendant says the testimony "made [it] appear as if he was a bad person," and "it likely inflamed the jury's passions about [defendant] being involved in a drug crime in the first place." We see no basis in the record for that conclusion.

Finally, in a related argument, defendant contends that the court was obliged to give a unanimity instruction. He is mistaken.

"As a general rule, when violation of a criminal statute is charged and the evidence establishes several acts, any one of which could constitute the crime charged, either the state must select the particular act upon which it relied for the allegation of the

20

information, or the jury must be instructed that it must agree unanimously upon which act to base a verdict of guilty." (*People v. Jennings* (2010) 50 Cal.4th 616, 679.) The rule has several exceptions, including the "continuous-course-of-conduct exception, which arises 'when the acts are so closely connected in time as to form part of one transaction' [citation] . . . ." (*Ibid.*) "There is also no need for a unanimity instruction if the defendant offers the same defense or defenses to the various acts constituting the charged crime." (*Ibid.*)

Defendant contends that "trying to rile up a crowd" to free him was one of two acts that could have supported the charge of resisting arrest; the other was the struggle in the car. In closing arguments, neither party mentioned "roiling up the crowd"; the prosecutor did not argue that defendant was trying to do so and defense counsel did not argue the contrary. Even if the jury understood the evidence as indicating that defendant tried to incite the crowd, the "continuous course of conduct" exception to the unanimity rule would apply. Defense counsel elicited Officer Lee's uncontradicted testimony that "[r]oughly a minute or two" passed from the time Officer Medellin "first made contact with the driver to the point where the driver was handcuffed . . . ." In short, even if the jury believed that defendant tried to incite the crowd by yelling, that conduct was contemporaneous with and inseparable from his struggle with the officers. The unanimity rule has no application here.

## DISPOSITION

The judgment is affirmed.


GRIMES, J.

We concur:


BIGELOW, P. J.



FLIER, J.

21